FRIEDMAN, Circuit Judge.
 

 The issues in this case, on appeal from the United States Claims Court,
 
 *
 
 are (1) whether a written modification of a government timber sale contract, by which the contractor agreed to increase the contract price for the timber in return for authority to use a cheaper logging method than the contract specified, was valid; and (2) if valid, whether the modification properly was applied to cover timber cut and removed prior to the modification. In his recommended decision, Trial Judge Yock of the United States Court of Claims upheld the modification, but gave it only prospective effect. He recommended that the court (1) enter judgment for the plaintiff for $40,031.65, constituting the additional charges the plaintiff had paid for timber cut before the modification, and (2) dismiss the government’s counterclaim, which sought the additional amount the government had neglected to collect from the plaintiff for timber cut before the modification.
 

 We affirm the trial judge’s decision that the modification was valid but reverse his ruling that the modification was effective only prospectively. We therefore reverse the judgment of the United States Claims Court and remand the case to that court to (1) enter judgment for the defendant on its counterclaim, and (2) dismiss the petition.
 

 
 *689
 
 I.
 

 A. The timber sale contract, entered into in February 1975, covered timber in a national forest. The major part of the contract was to cut Douglas fir trees. Because there was an epidemic infestation of Douglas fir bark beetles in the timberland of the forest, the logging was required to be completed by June 30, 1975, during the period when the insects lay dormant in the trees and therefore could be eliminated as the infested trees were removed.
 

 The plaintiff Peters’ timber sales contract was one of 10 contracts the government made for the forest during the winter of 1974-75. Four of the contracts, including Peters’, covered land totally or partially located in an area the United States Forest Service had proposed as a roadless wilderness. This meant that the Park Service could not build or authorize new roads in those areas. For this reason and because the June 30 deadline for completing logging prevented the Forest Service from taking the time to determine whether existing roads could be used for access and log removal, the Forest Service required that logging from these roadless wilderness areas be done by helicopter.
 

 Harvesting timber by helicopter is three or four times more expensive than conventional logging. The consequence is that the government receives less for timber .to be harvested by helicopter. The government received between $1 and $2 million dollars less than it would have obtained from the four areas where helicopters were required.
 

 The area for which Peters had the contract was subdivided into 10 units. The contract required units 1 to 3 and part of unit 4 to be conventionally logged (there was an existing Forest Service road that provided access to those areas). The balance was to be logged by helicopter.
 

 There was a narrow county road (the Carr Road) that skirted the area to be cut. The road had been used for logging but portions of it crossed private land. The road provided potential access for conventional logging of units 5, 6, and 10.
 

 Peters became aware of the proposed sale (the Skyo Line sale) in December 1974. He obtained the pertinent documents, carefully examined the area, and made his own estimate of the amount of timber to be recovered. He discussed the sale with Forest Service personnel.
 

 The trial judge found:
 

 One item explored in the discussions was an alternative access to portions of the sale area. The Forest Service acknowledged that there was access by routes other than as planned in the prospectus, sale map and contract. In particular, there was a concensus [sic] that the Carr Road, a county roadway, was in place and possibly could be used to haul timber from the lower portion of units 5 and 6 and all of unit 10. Plaintiff had used the Carr Road for access in visiting the sale site as had Forest Service personnel in laying out the sale[.] The Carr Road was an obvious topographical feature of the Skyo Line sale. Service personnel indicated that the sale was not planned using access to the Carr Road because they considered the road inadequate for timber hauling and they did not have sufficient time to gain easements (or whatever was necessary) from the private landowners claiming ownership.
 

 Fdg. 20(a).
 

 The government cannot sell timber for less than the greater of the Forest Service’s appraised value or a minimum stumpage rate the Service sets. In determining appraised value, the Forest Service first estimates the selling price of the finished lumber end products. From this it deducts the estimated logging and manufacturing costs, including profit. The Forest Service then divides between itself and the purchaser the difference between the estimated sales price of the end products and the operating costs of removing the timber. The government’s portion of this amount is the estimated fair market value of the timber, known as “stumpage.” For the Skyo sale, the government set a minimum stumpage rate of $5.39 per MBF.
 

 
 *690
 
 The Forest Service determined that the appraised value of the timber in the Skyo sale was minus $6.40 per thousand board feet (MBF). It therefore used its minimum rate of $5.39 per MBF as the minimum bid. In addition to the Douglas fir trees, there was a small amount of timber of lower quality to be removed. The Forest Service determined the additional value of this timber, described as per acre material (“PAM”), at 57 cents per acre. There were 174 acres of this material, and the purchaser was required to pay $99.18 for it.
 

 Following the receipt of qualifying bids for the minimum amount, the Forest Service on January 24,1975, conducted its usual oral auction to select the purchaser. Peters was the highest of six bidders. He bid a premium $32.61 over the minimum of $5.39, for a total price of $38 per MBF. The next highest bidder offered $37.05, and the bids then descended to $22.30, $20, $8, and $5.39. Based on the Forest Service’s estimate that 9,400 MBF could be obtained, Peters’ total bid was approximately $357,-000.
 

 Peters made his bid
 

 with a view toward seeking from the Forest Service a change in in [sic] the helicopter logging system designated for units 5, 6, and 10, to a more economical logging system. Plaintiff realized that the Forest Service would have to agree to the changes, but felt that this was a risk worth taking.
 

 Fdg. 23. In a logging plan Peters filed on February 18, 1975, he “indicate[d] his continued interest in changing the logging systems for several units.” Fdg. 24. He stated that he had obtained rights of way from private landowners “so logs can be hauled out the Karr [sic] Road,” that the county had indicated that “some improvements can be made to make [the road] safe for truck traffic” and that “[c]able yarding portions of Units 5, 6, and 10 are proposed.”
 
 Id.
 

 Between the auction and the award of the contract, Peters also made arrangements for helicopter service with a helicopter company whose work on another logging job had been halted temporarily because of bad weather. The contract with the helicopter company committed it to work regularly for Peters only until May 15, 1975, and from then until June 30, 1975 on a nonseheduled basis. The parties to the contract, however, expected the helicopter company to work for Peters only until around May 1.
 

 The Forest Service awarded the contract to Peters on February 20, 1975. As indicated, the contract provided for units 1 to 3 and part of 4 to be conventionally logged and the remainder to be logged by helicopter. The Forest Service “knew and accepted the possibility” that the helicopter company “was committed to another job to which they would go early in May or whenever weather conditions would allow.” Fdg. 28. Peters began logging operations shortly after the contract was awarded.
 

 B. Four days after the contract was awarded, Peters met with representatives of the Forest Service to continue discussing his proposed changes in logging methods. Peters “indicated his desire to change portions of certain clear cut units from helicopter to cable logging systems.” Fdg. 30. Forest Service personnel advised Peters to make a written request for the proposed change. They also informed him that the change would result in increased payments of approximately $10 per MBF, but that the deficit value appraisal of the timber “possibly could absorb some or all of such an increase, with no increase in actual stump-age to be paid by the plaintiff to the Government.”
 
 Id.
 

 Peters then made a written request to revise the logging plan to permit conventional instead of helicopter logging on units 5, 6, and 10. In response, the Forest Service told Peters that his request would have to be accomplished by a modification of the contract because the Forest Service intended to increase the contract rates.
 

 On April 22, 1975, Peters received the modification agreement. It authorized non-helicopter logging of the three units and increased the rates for the Douglas fir by $11.18 to $49.18 per MBF and for the PAM material by $11.05 to $11.62 per acre. The
 
 *691
 
 next day (April 23) the Forest Service ordered Peters to stop logging on units 5, 6, and 10 until the modification agreement was signed. On April 24, Peters signed the modification agreement. Although Peters contends that he verbally protested the increased rates, the trial judge found that “the oral protest has not been established.” Fdg. 40.
 

 The following day Peters resumed work on units 5, 6, and 10. He completed the contract by the June 30, 1975 deadline. Forest Service personnel and others “agreed that plaintiff had run a first-class operation.” Fdg. 43.
 

 The modification agreement, dated April 24, 1975, provided that its effective date was February 20, 1975, the date the contract was awarded to Peters.
 

 C. After the modification agreement was signed, Peters learned from a forester with a private company that it was the custom and practice in Region 6 of the Forest Service (which included the area of this sale) “to allow logging system changes by letter agreement with no formal modification or rate increase involved when those logging system changes met the objectives of the original contract as spelled out in Region 6 clause C6.42, which was a part of the contract herein.” Fdg. 45. Peters then filed a written protest with the Forest Service requesting that the price increases in the modification agreement be rescinded and that the original contract rates be reinstated, or alternatively, that the Forest Service submit the issue to the Comptroller General. After extensive consideration, the Forest Service declined to take either action. One of the grounds upon which the Chief of the Forest Service declined to submit the case to the Comptroller General was that
 

 [ojther bidders who were outbid by the purchaser could argue with justification that had they known we would permit such a modification, they would have been able to bid higher, too. Perhaps they could have bid even higher than the modified rates, since the risks of helicopter logging can be considered to be a deterrent by some potential bidders.
 

 Fdg. 49(5).
 

 Peters then submitted the case to the Comptroller General, who denied his claim. In a lengthy opinion, the Deputy Comptroller General held that the modification agreement was valid; that although the retroactive application of the higher rates violated a regulation of the Department of Agriculture, Peters could not complain about this action because he had agreed to the modification; and that the amount of the rate increases was proper.
 

 D. In the present suit, Peters sought damages of $133,433, which was the additional amount he paid for the timber as a result of the modification agreement. The parties subsequently stipulated that if Peters prevailed, he was entitled to recover $82,631. The government filed a counterclaim for $50,487.66. This covered the higher rate for the period from February 20, 1975 to March 31, 1975, which the government states it failed erroneously to charge Peters.
 

 After an eight-day trial, the trial judge held that the modification of the contract was valid, but that the higher rates were applicable only prospectively from the date of modification (April 24, 1975) and not retroactively to the date of award (February 20,1975), as the modification agreement provided.
 

 On the first issue, the trial judge held that the Forest Service had authority to modify the contract; that the custom and practice of Region 6 of the Forest Service did not require the agency to permit a change in logging from helicopter to conventional methods by letter agreement without increasing the rate; and that the modification was not the result of economic duress to which the government had subjected Peters.
 

 The trial judge refused to apply the higher rate retroactively for two reasons: (1) such retroactive application would violate a Department of Agriculture regulation providing that modification of a timber sales contract may apply only to its unexecuted
 
 *692
 
 portion; (2) since under the contract Peters had title to all timber cut and scaled prior to the modification agreement, it would violate the fifth amendment to subject that timber to the higher rate. The trial judge further held that the Forest Service properly had increased the rates by adding to the original contract rates the cost savings Peters obtained by substituting conventional for helicopter logging.
 

 The trial judge recommended that Peters should recover $40,031.66. This consisted of $38,985.22, representing the increased rate Peters paid the government for the Douglas fir he cut between April 1, and April 23, 1975, and $1,046.44, covering the higher rates he paid for PAM during that period.
 

 II.
 

 The written agreement that Peters and the government signed on April 24, 1975, modified the timber sales contract in two respects: (1) it authorized Peters to substitute on units 4, 5, and 10 the less expensive logging methods that Peters wanted to use for the helicopter logging the contract required; (2) it required Peters to pay the government higher rates for the timber which equalled Peters’ saving from using conventional logging methods. The modification thus benefitted both parties.
 

 Peters does not question the authority of the parties to a contract generally to make mutually acceptable voluntary modifications of its provisions. Instead, he argues that one aspect of the modification to which he agreed — the increase in the timber rates — was invalid for several reasons.
 

 A. Peters contends that the Forest Service had no authority to enter into the modification agreement. He refers to a Department of Agriculture regulation, 36 CFR § 221.7(e) (1975), which permits timber rates to be adjusted during the term of the contract only for four specified reasons, none of which covers this case. Similarly, section B8.3 of the contract authorized unwritten rate modification on the grounds specified in section B8.31, which also do not cover this case. Peters argues that since the regulations and contract expressly sanctioned other rate modifications but not those here made, the Forest Service was precluded from making the modification here at issue.
 

 What this argument overlooks, however, is that the modification provisions deal with unilateral modifications by the government, not with the consensual modification here made. That also was the situation in
 
 Everett Plywood Corp. v. United States,
 
 651 F.2d 723 (Ct.Cl.1981)
 
 (“Everett Plywood III”),
 
 upon which Peters relies. There the court held that the government had breached a timber sale contract by unilaterally cancelling it because it anticipated environmental damage from its performance. The court did not discuss whether in those circumstances the parties jointly could have agreed to cancel the contract without subjecting the government to liability for breach of contract, and there is nothing in that opinion even suggesting that such consensual cancellation would have been improper.
 

 As the trial judge pointed out, section B8.3 of the contract contemplates consensual modification. It states that “[t]his contract can be modified only by written agreement of the parties, except as provided under B8.31” (which, as noted, permits the government unilaterally to modify). It further provides that contract modifications “shall be in writing and may be made on behalf of Forest Service only by the Forest Service officer signing this contract, his successor or superior officer.” The contract thus distinguishes between modifications that the government may make unilaterally and other modifications that may be made only by written agreement of the parties. Nothing in the contract limits the kind of modifications that may be made by the latter method.
 

 Petitioner recognizes, as he must, in view of
 
 United States v. Corliss Steam Engine Co.,
 
 91 U.S. 321, 23 L.Ed. 397 (1875), that the Secretary of Agriculture had inherent authority to enter into contracts. Apparently he also recognizes that under that principle the Secretary has inherent
 
 *693
 
 authority to modify timber sales contracts and increase rates. He argues, however, that the Secretary had not delegated his modification authority to contracting officers of the Forest Service.
 

 The regulations of the Department of Agriculture, however, delegate the Secretary’s statutory authority to sell timber (16 U.S.C. § 476 (1974)) to the Chief of the Forest Service and authorize the latter to delegate this authority to subordinates, 36 C.F.R. § 221.6(b) (1975). This delegation of authority to the Forest Service Chief to enter into such contracts necessarily and inherently includes the authority to enter into modifications of them as well.
 
 Corliss Steam Engine Co., supra,
 
 held that the Secretary of the Navy had inherent authority, as an incident of his general authority to enter into contracts, to settle disputes with contractors. By the same reasoning, the Forest Service Chief, who is authorized to execute contracts for the government, also has inherent authority to enter into modifications of those contracts.
 

 In turn, the Forest Service Chief has expressly delegated to contracting officers both his authority to enter into timber sales contracts (Forest Service Manual ¶¶ 2430.3, 2430.43), and his implicit authority to modify such contracts. Forest Service Manual ¶ 2433.21 provides that permissible modifications not changing “the original notice of sale ... may be approved by the officer having the authority to approve the contract, his successor, or his superior, subject to [regulations limiting the volume of timber which such officials can sell.]” Indeed, Peters’ own contract recognized this modification authority of the contracting officer, since it, too, permitted written modifications to be made for the Forest Service “only by the Forest Service officer signing this contract, his successors or superior officers.”
 

 B. Peters next contends that there was a settled practice in Region 6 of the Forest Service to permit changes in logging methods by a letter agreement which would not result in increased rates, and that therefore it was arbitrary and capricious for the Forest Service to require him to agree to a modification of the contract providing for higher rates.
 

 The trial judge, however, found that the “outer limits” of this custom and practice had not been established as to whether they “contemplated a logging system change from helicopter to cable or tractor logging by use of a simple letter agreement.” Fdg. 56. He pointed out that the changes in logging that had been permitted in Region 6 by letter agreement “occurred particularly with small sales,” that there had been “very few cases of logging system changes allowed by letter agreement in which substantial cost changes were involved,” and that this “was the first case in Region 6 which involved a requested logging system change from the high cost helicopter logging system to the much lower costing eable/tractor logging systems.” Fdg. 55. These findings are supported by substantial evidence, and they destroy the basic premise of Peters’ contention that there was an established custom and practice that covered the novel situation in this case.
 

 Peters relies heavily on an earlier
 
 Everett Plywood
 
 case
 
 (Everett Plywood Corp.
 
 v.
 
 United States,
 
 512 F.2d 1082 (Ct.Cl.1975)
 
 (“Everett Plywood II”)).
 
 There the court held that the government had breached a timber sales contract by refusing to extend the contractor’s time for performance. Unlike the present ease, however, in
 
 Everett Plywood II
 

 the evidence [was] clear that, at the time the contract was executed, the Forest Service had a well-established practice or custom with respect to granting extensions. As noted previously, this practice was a very liberal one in which extensions were granted with very little urging by the contractor, and plaintiff was well aware of that practice. In practical operation, extensions of contracts were always granted by the Forest Service unless there was a demonstrable disadvantage to the United States.
 

 512 F.2d at 1088-89. Moreover, there the contractor routinely had received extensions under the contract for eight years.
 
 *694
 
 Finally, the court ruled that in denying the particular extension there at issue, the government had not applied its normal standard of granting extensions unless they would be disadvantageous to the United States but instead had applied the stricter standard of requiring the contractor to show that there were “extraordinary conditions” to justify a further extension. 512 F.2d at 1089-90.
 

 Peters makes essentially the same argument in different form in his contention that the contract contained “an implied warranty that rates will not be increased when one logging system, which meets contract objectives, is substituted for the prescribed one.” Our discussion of the “practice and custom” issue is equally applicable to this reformulation of the argument and requires its rejection. Peters’ reliance on
 
 Everett Plywood III
 
 to support the implied warranty argument is misplaced because, as noted earlier, that case involved unilateral action by the government and not, as here, a consensual modification.
 

 C. Peters also argues that he signed the modification agreement as a result of economic duress or coercion. The trial judge rejected this contention — correctly — on the ground that “[t]he facts of this case, however, do not support a finding of economic duress .... ”
 

 In
 
 Rixon Electronics, Inc. v. United States,
 
 536 F.2d 1345 (Ct.Cl.1976), the Court of Claims stated that to establish a case of “economic duress” the contractor must show two things: (1) that “wrong by the Government must have caused the contractor’s distress” and (2) that “the Government must have exploited the distress it had itself created, to obtain an unjustified” advantage. 536 F.2d at 1348. “The mere stress of business conditions will not support duress contentions when the Government is not responsible for the underlying circumstances.”
 
 Id.
 
 Whether economic distress existed “must of necessity depend upon the circumstances of each individual case.”
 
 Fruhauf Southwest Garment Co.
 
 v.
 
 United States,
 
 111 F.Supp. 945, 951 (Ct.Cl.1953).
 

 The trial judge discussed in adequate detail the reasons why the facts of this case did not establish economic distress or coercion, and there is no need to repeat that discussion. In brief, he correctly concluded that the government did not act improperly in insisting upon a formal modification of the contract that required Peters to pay more for the timber; that the “serious financial and time pressures” that Peters then faced “as a result of the contract requirements ... was not due to wrongful or improper conduct by the Government [but] was pressure generated from the contract situation”; and that Peters “knew the short term high risk nature of the contract before bidding,” and that the Forest Service “would grant no extensions” beyond the June 30, 1975 deadline for completing removal of the timber.
 

 Peters had not shown that in the circumstances of this case his signing of the modification agreement was the result of economic duress or coercion.
 

 D. Finally, Peters contends that enforcement of the rate increase provisions of the modification agreement would be unconscionable, and that the court therefore should reject them. The grounds upon which Peters bases this argument, however, are essentially the same as those he asserts in the other arguments he makes. The reasons we have given for rejecting those other contentions also require rejection of the unconscionability argument. Nothing in
 
 Rixon Electronics, supra,
 
 upon which Peters relies, calls for a contrary conclusion.
 

 Peters’ contentions fall far short of showing that the modification agreement was an unconscionable contract. Such a contract has been defined as one “which no man in his senses, not under a delusion, would make, on the one hand, and which no fair and honest man would accept on the other.”
 
 Hume v. United States,
 
 21 Ct.Cl. 328, 330 (1886),
 
 aff’d
 
 132 U.S. 406, 10 S.Ct. 134, 33 L.Ed. 393 (1889), quoted with apparent approval in
 
 Fraass Surgical Mfg. Co. v. United States,
 
 571 F.2d 34, 40 (Ct.Cl.1978).
 

 
 *695
 
 Since Peters has raised the issue of unconscionability, however, it is appropriate to point out that there are two considerations of fairness that support the validity of the modification.
 

 1. The contract was let on the condition that certain portions of the timber would be logged by helicopter, which is a much more expensive method of logging than conventional techniques. All of the bidders were aware of the requirement, and presumably all of them (other than Peters) calculated their bids on that basis. If the other bidders had thought that they could substitute conventional logging methods for helicopter on units 5, 6, and 10, they might have bid substantially more than they did.
 

 It would have been unfair to the other bidders, and indeed, would have compromised the entire bidding process if, after the contract had been awarded on that basis, Peters were permitted to avoid his agreement to pay the higher rates in return for being permitted to use the cheaper logging method. As noted,
 
 supra,
 
 at p. 691, this was one of the grounds upon which the Forest Service Chief refused to refer Peters’ claim to the Comptroller General. The Chief pointed out that if the other bidders had “known [that the Forest Service] would permit such a modification, they would have been able to bid higher, too” — perhaps even more than the modified rates, “since the risks of helicopter logging can be considered to be a deterrent by some potential bidders.” Fdg. 49(5).
 

 The Court of Claims faced a similar issue in
 
 Farwell Co. v. United States,
 
 148 F.Supp. 947, 137 Ct.Cl. 832 (1957). There, although a contract required that either copper or brass pipe be supplied, the contractor attempted to use cheaper copper tubing, which it contended would give equally satisfactory results. In holding that the government was entitled to the copper pipe that the contract specified, the court made the following statement which, with slight changes, is equally applicable to the present case:
 

 Another more important reason for requiring strict compliance with the contract terms in this case is that to permit the use of “tubing” instead of “pipe” when the contract specified “pipe” would be to put the plaintiff in a more advantageous bidding position than other bidders. The plaintiff knew that tubing was much cheaper than pipe and calculated its bid thereon. If the other bidders calculated their bid based on “pipe,” it cannot be denied that plaintiff would be put in a more advantageous position because of the lower cost to it of tubing.
 

 Id.
 
 148 F.Supp. at 949-50, 137 Ct.Cl. at 836-37.
 

 2. Peters knew that under the contract he was required to log units 5, 6, and 10 by helicopter. He made a high bid in the hope that he could persuade the Forest Service to allow him to use cheaper conventional logging methods on those units without any change in rates. At the time he signed the contract, he was not even aware of the alleged practice in Region 6 that changes in logging methods could be made by a simple letter agreement without any change in rates. Here, as in
 
 Farwell Co., supra,
 
 Peters “took a calculated risk” when he made the high bid in the anticipation he could be permitted to use the cheaper logging methods, “and cannot now complain” that he was not allowed to do so.
 
 Id.
 
 148 F.Supp. at 950, 137 Ct.Cl. at 838.
 

 III.
 

 The modification agreement, which sets the new higher rates of $49.18 per MBF for Douglas fir and $11.62 per acre for PAM material, was signed on April 24, 1975. It stated:
 

 All conditions of this agreement become effective on and after February 20, 1975 [the date on which the contract was awarded to Peters].
 

 Although the modification agreement provided that the higher rates there prescribed were to be paid for all timber cut from the inception of the contract, the trial judge applied the higher rates only to timber cut after the modification agreement was signed. He gave two reasons for this conclusion: (A) A regulation of the Depart
 
 *696
 
 ment of Agriculture bars retroactive modification of timber sales contracts; (B) since under the contract title to the timber Peters had cut prior to April 24, 1975, already had passed to him, it would violate the fifth amendment to apply the higher rates in the modification agreement to that timber.
 

 A. The regulation (36 C.F.R. § 221.16(a) (1975)) provides:
 

 Timber sale contracts may be modified only when the modification will apply to unexecuted portions of the contract and will not be injurious to the United States. Modifications permitted by this section may be made by the officer approving the sale, by his successor, or by his superi- or.
 

 Giving the language its normal meaning and considering that the same regulation permits the Forest Service unilaterally to change timber rates for specified reasons (36 C.F.R. § 221.7(e)), in the context of this case this provision merely prohibits the Forest Service unilaterally from increasing timber rates. It identifies the officers by whom the “[mjodifications permitted by this section may be made.” Ordinarily one would not say that an official who signed a consensual modification agreement “made” the modification. Rather, one would say that he “entered into” or “executed” the instrument. When applied to modification of an agreement, the word “made” connotes unilateral and not bilateral action.
 

 Although there are provisions in the Forest Service Manual that refer to bilateral “modifications,” they are not inconsistent with our conclusion that section 221.16(a) of the Department of Agriculture Regulations does not bar the retroactive application of higher timber rates made through bilateral modification. The Manual is intended to guide Forest Service personnel in handling timber sales contracts. It indicates circumstances in which modifications may be appropriate, and suggests that in some of those instances bilateral modifications should be negotiated. However, the Manual does not address the question whether the bar to retroactive modification contained in the regulation covers bilateral or only unilateral changes. We do not construe the Manual to preclude the retroactive bilateral modification that Peters voluntarily signed.
 

 In any event, by agreeing to the modification, Peters waived any objection he might have had to its retroactive effect. The trial judge found that Peters had not established that he orally protested the increased rates. Moreover, Peters’ alleged oral protest was directed against any increase in rates and not against their retroactive application. Although the trial judge ruled that Peters’ waiver was not “knowing” because Peters was unaware of the regulation, Peters was charged with knowledge of the regulation because it had been published in the Federal Register (18 Fed.Reg. 7194 (1953)).
 
 Federal Crop Insurance Corp. v. Merrill,
 
 332 U.S. 380, 385, 68 S.Ct. 1, 3-4, 92 L.Ed. 10 (1947). Peters was aware that the modification agreement covered all timber under the contract, including that already cut, yet he voluntarily signed the agreement. He cannot now complain because the agreement was retroactive.
 

 If Peters had objected to the modification as being retroactive, the government easily could have restructured it so as to achieve the same result while avoiding this problem. In determining the amount of the increase in rates, the government reappraised the timber under the so-called “sale as a whole” method
 
 (see Timber Access Industries Co. v. United States,
 
 553 F.2d 1250 (Ct.Cl.1977)), which was designed to give the government the benefit of the total savings Peters realized under the modification agreement. The device the government selected to accomplish that objective was to increase the rate for all of the timber the contract covered by $11.18 per MBF.
 

 If the government were precluded from applying the higher rate retroactively, presumably it would have increased the rates prospectively by a sufficiently higher amount to accomplish the same result it obtained under the modification agreement Peters had signed. Having received the benefit of the modification agreement, Pe
 
 *697
 
 ters cannot now escape its burden on the ground that the government had no authority to apply the increased rates retroactively-
 

 B. By making all its terms and conditions effective as of the date the original contract was signed, the modification agreement made the higher rates applicable to all timber cut under the contract, including that cut before the modification agreement was signed. The fact that Peters had obtained title to the latter category of timber is immaterial. Neither the trial judge nor Peters gave any reason why Peters could not voluntarily have agreed to pay more for all the timber cut under the contract, including timber to which he had already obtained title. The prohibitions of the fifth amendment are directed against action by the government, not against bilateral modification of a contract to which the government is a party. See Nichols,
 
 The Law of Eminent Domain
 
 § 6.1 (Rev.3d Ed. 1978) (the fifth amendment “is directed against the enforcement of an act of the legislature which attempts to authorize the seizure or destruction of property against the will of the owner”).
 

 IV.
 

 Peters’ final contention is that even if the modification was valid and applicable retroactively, the government nevertheless should not have increased the timber rates to reflect the additional savings he achieved. The Forest Service increased the rate for Douglas fir by $11.18 to reflect the difference between the original appraisal rate of minus $6.40 for MBF and the new appraised rate (under the changed logging method) of $4.78 per MBF.
 

 The Comptroller General explained Peters’ argument and correctly answered it— an analysis with which both the trial judge and ourselves agree — as follows:
 

 Mr. Peters essentially contends that since the “appraised” value of the sale was $11.79 below the advertised base rate and the alleged savings from the modification were $11.18, no additional stump-age rate should have been required, inasmuch as Mr. Peters was essentially being charged the $11.18 twice under the Forest Service’s calculations. That is, the reappraised value of the timber should have been calculated as $4.78 per MBF by adding the $11.18 per MBF to the minus $6.40 per MBF appraised value — which is below the $5.39 per MBF minimum sale rate.
 

 From our review, we disagree with Mr. Peters’ calculations. He was not charged $11.18 twice; rather, an adjustment to the price he bid under competition was made to reflect the net savings he achieved by virtue of his requested alternate logging methods. Mr. Peters contracted to pay a $38.00 stumpage rate— not the timber’s “appraised” value. Consequently, the contract price — not the appraised value — is the critical figure to be recalculated in making an equitable adjustment because of a contract modification.
 

 Timber Access Industries Co. v. United States, supra,
 
 upon which Peters relies, actually supports the Comptroller General’s analysis. There the Court of Claims held that in increasing rates pursuant to a timber sale contract, the government properly added the higher rates to the premium above the Forest Service’s appraised value the contractor had bid. Rejecting the contractor’s contention that the addition of the bid premium to the increased rates was a penalty and therefore void, the court pointed out that “plaintiff originally bid the higher figure, including the bid premium, in order to win the contract.” 553 F.2d at 1257.
 

 CONCLUSION
 

 The judgment of the United States Claims Court is reversed. The case is remanded to that court to (1) enter judgment for the United States on its counterclaim for $50,487.66, and (2) dismiss the petition.
 

 REVERSED and REMANDED.
 

 *
 

 Pursuant to order of this court dated October 4, 1982, Judge Yock, on October 8, 1982, entered a final judgment in accordance with his recommended decision of August 5, 1981. We treat the parties’ exceptions to that decision as cross-appeals from that final judgment.