**GLOPAK CORPORATION, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 77–85C.**

United States Claims Court.

March 30, 1987.

James J. McCullough, Washington, D.C., for plaintiff. Carl J. Peckinpaugh, of counsel.

Sharon Y. Eubanks, with whom were Asst. Atty. Gen. Richard K. Willard, and David M. Cohen, Washington, D.C., for defendant.

## OPINION

BRUGGINK, Judge.

Glopak Corporation instituted action under the Contract Disputes Act of 1978, 41 U.S.C. §§ 601–613 (1982), appealing from the final decision of the Contracting Officer which rejected plaintiff's claim for $34,165.48, and awarded the government $638,266.64. The case is currently before the court on defendant's motion for summary judgment and plaintiff's cross-motion for partial summary judgment. After consideration of the parties' submissions and oral argument, the court concludes that there are no material facts in dispute and that defendant is entitled to judgment as a matter of law.

### I. *Factual Background*

Glopak is engaged, *inter alia,* in the manufacture and supply of plastic bags to the United States government, principally to the General Services Administration ("GSA"). At the time this dispute arose, it participated in the special set-aside program administered by the Small Business Administration ("SBA") for economically and socially disadvantaged small businesses pursuant to § 8(a) of the Small Business Act of 1953, as amended, 15 U.S.C. § 637(a) (1982).[1]

In late 1980 or very early 1981, GSA Region 5 sought the approval of the GSA Office of Contracts for the use of an economic price adjustment ("EPA") clause in Solicitation No. 5FCB–13–81–024 (024 Solicitation) for polyethylene plastic bags. Such an EPA clause provides for an upward or downward adjustment of the price if certain economic conditions change during contract performance. This particular EPA clause was tied to the Producer's Price Index ("PPI") for polyethylene resin, a petroleum based product comprising approximately 75% of the raw material used in the manufacture of plastic bags. The PPI is compiled and published by the Bureau of Labor Statistics of the Department of Labor. On February 25, 1981, the Cost and Pricing Division of the Office of Contracts informed Region 5 that it had reviewed and slightly modified the proposed EPA clause, which had been used in a previous solicitation for polyethylene plastic bags.[2]

On March 13, 1981, GSA issued the 024 Solicitation seeking bids for the supply of plastic bags. The solicitation was in effect from June 1, 1981 until May 31, 1982. Pursuant to this solicitation, on May 3, 1982, by contract number GS–05S–12290, the SBA agreed to supply GSA 537,719 boxes of plastic bags at the fixed price of $6,455,749.84 ("prime contract"). Under the prime contract, SBA delegated to GSA the authority to administer the subcontract and the responsibility to make payments directly to the subcontractor. On May 20, 1982, SBA subcontracted with Glopak upon the same quantity, delivery, and price terms as the prime contract in contract number SB2–10–8(a)–82C–033 ("subcontract").

Both the prime contract and subcontract were thus awarded under the 024 Solicitation. Both were also for a fixed price, subject to identical EPA clauses which provided:

### ECONOMIC PRICE ADJUSTMENT

(a) The unit price(s) of all items which are purchased under this contract are subject to price adjustment, upward or downward, by the application of the formula set forth in (b) below. The index to be used in the computation of the price adjustment(s) shall be *PE Resin, Low, Film and Sheeting, Commodity Code 0662–0301,* as quoted in the monthly publication "Producers

---

1. Section 2[8](a) of the Small Business Act delegates to the SBA the authority and obligation to contract with any federal agency to furnish required goods or services and to subcontract with small businesses for performance of the contract. Under the § 2[8](a) program, upon SBA's determination of the subcontractor's competence, it negotiates a procurement contract with the agency. Afterwards, SBA enters into two contracts—a prime contract with the agency and a subcontract with the § 2[8](a) subcontractor.

2. Plaintiff was awarded the contract under that previous solicitation on March 16, 1981. That particular EPA clause was not enforced in the administration of the contract.

Prices and Price Indexes" which is issued by the U.S. Department of Labor, Bureau of Labor Statistics.

(b) The indexes published for the month of April 1982 shall be used as the base for determining price adjustments. The indexes for the third, sixth, and ninth succeeding months of the contract period shall be used in determining the adjusted contract price(s) for the respective ensuing three month period. Contract price adjustments shall be determined by the following formula: (Unit price × material cost factor(s) set forth below) × % change in the said index = amount of price increase, provided that no price adjustment shall be made unless such index increase or decrease is three (3) percent or greater. Whenever a price adjustment is made pursuant to this clause, the index which was used for computing the adjustment shall become the new base index for determining further adjustments.

\* \* \* \* \* \*

(c) The contractor shall submit a written request for price adjustment and such request shall include the new price(s) and the basis for the determination. In the event of a decrease, the Government has the right to unilaterally adjust the contract price(s).

\* \* \* \* \* \*

(f) The aggregate of the increase in any contract unit price made under this clause shall not exceed 30 percent of the original unit price. There is no percentage limitation of the amount of decrease made under this clause.

During contract negotiations, Glopak representatives expressly asked that the subcontract be awarded without the PPI-based EPA clause. According to Glopak, this request was based upon its previous experience with GSA contracts involving such a clause, leading it to conclude that the clauses were irrational and likely to cause serious economic injury. Glopak asserts that notwithstanding its objections, GSA officials stated the EPA clause was mandatory and could not operate to the detriment of Glopak. Glopak thus failed in its efforts and the final version of the contract contained the PPI-based clause.

On July 21, 1982, two months after the award of the contract by letter dated May 20, 1982, Glopak again requested that the EPA clause be eliminated from the contract. GSA agreed to submit Glopak's request to GSA's Contract Review Division. The request was denied.

Under the EPA clause, the PPI for the third, sixth and ninth month of the contract period are used in determining whether an adjustment to the contract price is necessary based on a fluctuation in the price of resin. Between the base index of April 1982 and the third contract month, July 1982, the PPI decreased by 17.9%. Based on this decrease, on August 25, 1982, the Contracting Officer signed Modification A–2, decreasing the unit prices of the subcontract. Issuance of the modification was delayed pending further discussion, however, upon Glopak's request. Glopak was unsuccessful, and on January 13, 1983, Modification No. A–2 was issued and the unit price adjustment was made effective retroactively to September 1, 1982.

By letter of January 21, 1983, Glopak challenged the downward price adjustment, contending that it would result in a windfall profit for the government and a substantial loss for the contractor. Glopak provided an analysis showing that while the PPI dropped almost 18 percent between April and July 1982, Glopak's raw material cost for polyethylene resin actually *increased* by more than 5 percent during the same period. Glopak requested a meeting with GSA and SBA representatives concerning Modification A–2 and specifically requested that its implementation be deferred pending such meeting. By letter dated January 28, 1983, GSA stated that it could not delete the EPA clause from Glopak's § 8(a) subcontract, and that the utilization of the clause was appropriate because the price of polyethylene bags had been too erratic to be equitably contracted for without a price adjustment clause.

On March 14, 1983, Glopak once again asked GSA to defer implementing the modification because of severe financial consequences to the company. The modification was again delayed and Glopak completed contract performance in April and was paid at the original base contract price. On August 15, 1983, however, GSA informed Glopak officials by telephone that GSA believed Glopak had been overpaid and requested a meeting to discuss return of the overpayment. Glopak informed GSA that it was not able to pay the government's claim and that a meeting to discuss such payment would serve no purpose.

On August 25, 1983, Glopak submitted a claim to the contracting officer in the amount of $34,165.48 representing additional raw materials costs incurred in performing the subcontract. On February 7, 1984, by final decision of the contracting officer, the Government was awarded $638,266.64, the net price decrease under the EPA clause. This decision also denied Glopak's claim of $34,165.48, on the grounds that there was no provision in the contract for adjustment of price based upon such costs. The complaint was filed on February 5, 1985.

## II. *Pleadings*

Count I of the complaint alleges that defendant's failure to abide by GSA procurement regulations regarding the inclusion of the EPA clause renders the clause void and unenforceable. In Count II, it is claimed that the EPA clause is akin to an unenforceable liquidated damages clause because it is penal in nature. Count III alleges that it is unconscionable and against public policy to permit the government to recover any sums under its EPA claim against Glopak because such recovery would give the government a wholly undeserved windfall while resulting in a forfeiture for Glopak. In Count V Glopak seeks a recovery in the amount of $34,-165.48 on a theory of quantum meruit and/or quantum valebant.[3]

3. Glopak amended its complaint on November 17, 1986 and withdrew Count IV.

4. Aside from this approval process conducted for the inclusion of the EPA clause in the 024

Defendant has moved for summary judgment on all counts and plaintiff has cross-moved for partial summary judgment as to Count I.

## III. *Discussion*

*Compliance With Approval Requirements*

■ Glopak argues that the relevant GSA procurement regulations require approval of the use of an EPA clause at both the solicitation and contract levels. First, with respect to the solicitation, it points to the following procurement regulation:

[P]rice adjustment clauses shall not be included in solicitations without prior Central Office approval. Each request for approval, together with a statement of the justifying circumstances and copy of the proposed clause, shall be submitted to the appropriate assistant commissioner.

GSPR § 5A–7.103–73(b), 41 C.F.R. § 5A.7103–73(b) (1981) ("§ 73").

In early 1981, GSA Region 5, which conducts contracting for plastic bags, sought the approval of the Office of Contracts of the GSA (part of the central office of GSA's Office of Federal Supply and Services) for the use of a PPI-based EPA clause in the 024 Solicitation. On February 25, 1981, the Cost and Pricing Division of the Office of Contracts informed Region 5 that it approved a slightly modified version of a PPI-based EPA clause for use in the 024 Solicitation.[4] Although Glopak admits that these facts show that the solicitation received central office approval, it argues that the regulation was not fully complied with since there is no showing that the request for approval was "submitted to the appropriate assistant commissioner" as required by § 73.

In response, defendant asserts that the responsibility of the relevant assistant commissioner under § 73 in this respect has been delegated to the Office of Contracts,

Solicitation, no separate approval process was specifically undertaken for the inclusion of the EPA clause in the subcontract itself.

Cost and Pricing Division, and that this office did receive and approve the clause in the solicitation. Defendant bases this assertion on the language of a policy letter implementing § 73 with respect to § 8(a) contracts. P.L. 295–2, ¶ 5(e)(2)(f) ("P.L. 295"). This letter requires prior approval of an EPA clause for § 8(a) contracts "in accordance with § 5A–7.103–73(b)" and that the "[r]equest for approval shall be submitted through the Office of Contracts (FC), Office of Cost and Pricing (FCC)." According to the uncontradicted declaration of Charles Hulick, P.L. 295 is as a delegation of authority from the Assistant Commissioner of Federal Supply and Services to the Office of Contracts, Cost and Pricing Division, for the approval of EPA clauses in GSA procurement contracts. Because GSA Region 5 submitted its request for approval of the solicitation to the Office of Contracts, attention of the Director of the Cost and Pricing Division, and since this delegee of the Assistant Commissioner subsequently approved inclusion, the court concludes that the procedures of § 73 were followed.

■ Glopak goes on to argue, however, that the very policy letter relied on by defendant to show a delegation of authority for approval of the solicitation creates a separate approval process for the inclusion of the EPA clause in a § 8(a) subcontract. Glopak's argument is based on the language of P.L. 295 that "[t]he Economic Price Adjustment shall NOT be included in the 8(a) *contracts* without prior approval pursuant to [§ 73]." (Emphasis added.) In other words, it is Glopak's contention that approval for use of the clause in the solicitation does not accomplish a separate approval also required for inclusion in any § 8(a) subcontract awarded under the prime contract.

Glopak's reading of P.L. 295 is unsupportable. The plain meaning of the letter is that an EPA clause cannot be included in an § 8(a) subcontract unless there was cen-

tral office approval for inclusion of the clause in the solicitation. "[A]pproval pursuant to [§ 73(b)]" is no more than a reference to the obligation to get approval of the solicitation. This is an important reminder because the terms and conditions of the solicitation for all practical purposes become the contract. Here there is no dispute that the central office approved inclusion of the clause in the 024 Solicitation under which both the prime and subcontracts were awarded. The court finds that GSA's procurement regulations were followed and the EPA clause was properly included in the parties' contract.[5]

*Is the EPA Clause Akin to Liquidated Damages?*

■ Glopak's theory in Count II is that the EPA clause is akin to an unenforceable liquidated damages provision because it is penal in nature. While it is true that liquidated damages will not be awarded under those circumstances, *see Priebe & Sons, Inc. v. United States,* 332 U.S. 407, 68 S.Ct. 123, 92 L.Ed. 32 (1947), no analogy can be drawn between a liquidated damage clause and a price escalation clause. The former is a device to fix damages in advance of a possible breach of performance, and is used therefore in lieu of performance. An escalation clause, on the other hand, does not assume a breach. It provides instead an objective method of adjusting the contract price upwards or downwards if economic conditions fluctuate during the contract term. The EPA clause does not attempt to extract damages from the contractor for a breach. Rather it attempts to minimize the contingencies in a firm fixed-price contract. *See Beta Systems v. United States,* No. 738–85C, slip op. at 25 (Cl.Ct. Oct. 9, 1986).

The mere fact that the clause did not operate favorably for plaintiff does not permit the contractor now to contest its operation. It is clear that the inclusion of the EPA clause with the PPI index reflected an

5. Defendant argues that the relevant regulations are designed for the benefit of the government and no one else, and therefore plaintiff cannot complain if there is noncompliance. *See Perkins v. Lukens Steel Co.,* 310 U.S. 113, 127, 60

S.Ct. 869, 876, 84 L.Ed.2d 1108 (1939); *C & L Construction Co. v. United States,* 6 Cl.Ct. 791, 804 (1984), *aff'd* 790 F.2d 93 (Fed.Cir.1986). That question need not be addressed, however, since the court has found compliance.

agreement between the parties. During pre-award negotiations under the 024 Solicitation, a representative of Glopak expressed concern that the EPA clause might not accurately represent changes in resin prices and asked that it be deleted from the subcontract. The concern was based, in part, on plaintiff's prior experience with the clause. Glopak had entered into at least one previous contract with GSA for the production of plastic bags for SBA which had an EPA clause based upon a PPI. Defendant refused to delete the clause. Glopak with full knowledge of the fact that the clause remained, entered into the contract. This court cannot now deny enforcement of the clause which Glopak fully agreed to in order for plaintiff to avoid the consequences of its bargain. *See Beta Systems*, slip op. at 33.

*Unconscionability*

In Count III, Glopak asserts that enforcement of the EPA clause would be unconscionable, arguing that enforcement of the clause would lead to a windfall to the Government, and would have been "commercially impracticable" for Glopak. This court has recognized the concept of unconscionability and defined an unconscionable contract as one "which no man in his senses, not under delusion, would make on the one hand, and which no fair or honest man would accept on the other. . . ." *Hume v. United States*, 21 Ct.Cl. 328, 330 (1886), *aff'd*, 132 U.S. 406, 10 S.Ct. 134, 33 L.Ed. 393 (1889); *see also Louisiana-Pacific Corp. v. United States*, 228 Ct.Cl. 363, 656 F.2d 650 (1981); *Fraass Surgical Mfg. Co., Inc. v. United States*, 215 Ct.Cl. 820, 571 F.2d 34 (1978); *Gregory Lumber Co. v. United States*, 11 Cl.Ct. 489 (1986). In analyzing the allegation of unconscionability the court should look for some type of oppression, unfair surprise and lack of consent at the time of entering into the contract. *Gregory Lumber*, 11 Cl.Ct. at 504. Glopak's conclusion that enforcement of the clause leads to a windfall for the government is simply not an independent basis for rewriting the contract. As pointed out in the *Fraass* decision upon which Glopak relies, "discretion to deny enforcement to an unconscionable clause . . . is not

extended to permit courts to redistribute risks allocated by differences in bargaining power, but rather to prevent oppression and unfair surprise." *Fraass*, 215 Ct.Cl. at 830, 571 F.2d at 40.

There is no indication that the clause could be considered unconscionable or oppressive at the time the contract was entered into. Initially, the court observes that the price escalation clause met the test of *American Transparents Plastics Corporation*, No. B-210898, 83-2 CPD ¶ 539 (1983), that the basis of measurement of price fluctuation not be under the control of the contractor and must reflect an "objective standard other than the bidder's own prices as the basis upon which the price adjustment [were to] be made." Here it is clear that the clause sets up an objective standard, since it is based on national indices prepared by the Bureau of Statistics of the Department of Labor. Clauses employing such neutral indices are generally favored. *See American Transparent Plastic*, 83-2 CPD ¶ 539; *California Microwave, Inc.*, Comp.Gen.Dec. B-202317, 81-1 CPD ¶ 505 (1981); Nash & Cibinec, *Formation of Government Contracts* at 728 (1986).

Neither can Glopak claim surprise or lack of consent. Glopak had encountered a similar EPA clause in a previous contract with the GSA and SBA, and requested that the clause be removed from the present contract because of Glopak's concern that the index did not accurately mirror the resin market. Glopak was neither ignorant of the use of the EPA clause, nor unexposed to the vagaries of the petrochemical market. Moreover, the language of the clause itself was explicit that "[i]n the event of a decrease, the Government has the right to unilaterally adjust the contract price[s]." While the clause provided a ceiling for an increase of the contract price of 30 percent, it provided that there was "no percentage limitation of the amount of decrease made under this clause." Although there is no doubt that Glopak did not like the terms of the contract, it has failed to point to some type of oppression, surprise or vitiated con-

sent necessary for this court to deny enforcement.

Finally, Glopak's references to cases dealing with the concept of commercial impracticability are not apposite. Glopak argues that it would never have entered into or performed on the contract if it had known the clause would operate as it has because it would be commercially senseless. Plaintiff's argument rests solely on the element of unanticipated expense involved—$638,266.64 to be deducted from the original contract price of $6,455,749.84. However, an increase in cost beyond that originally contemplated by the contract does not render it commercially senseless. *Jennie–O Foods, Inc. v. United States*, 217 Ct.Cl. 314, 580 F.2d 400 (1978); *Anthony P. Miller, Inc. v. United States*, 161 Ct.Cl. 455, *cert. denied*, 375 U.S. 879, 84 S.Ct. 149, 11 L.Ed.2d 111 (1963). Even very substantial cost increases—far in excess of the ten percent increase here—have not warranted a finding of commercial impracticability. *See, e.g., American Trading and Production Corporation v. Shell International Marine, Ltd.*, 453 F.2d 939 (2d Cir.1972) (an increase of $131,978.44 over the $417,327.36 held not sufficient to constitute commercial impracticality); *Transatlantic Financing Corp. v. United States*, 363 F.2d 312 (D.C.Cir.1966) (added expense of $43,972.00 above and beyond contract price of $305,842.92 did not constitute commercial impracticability); *Jalaprathan Cement Co.*, ASBCA No. 21248, 79–2 BCA ¶ 13,927 (1979) (a loss of $208,408.59 out of a contract price of $639,933.08 held not so excessive to be commercially senseless).

*Estoppel*

Glopak also argues that defendant should be estopped from seeking enforcement of the clause because representatives of SBA and GSA stated that it was for the contractor's benefit and could not operate to the detriment of Glopak. Glopak asserts that it entered into the contract as a result of these representations.

Estoppel is a concept which prohibits a party from escaping liability for his statements, actions or inactions if they have been relied on by the other party. *Manloading & Management Associates*, 198 Ct.Cl. 628, 461 F.2d 1299 (1972). The Court of Claims in *Emeco Industries, Inc. v. United States*, 202 Ct.Cl. 1006, 1015, 485 F.2d 652, 657 (1973), adopted the following rule from the *United States v. Georgia-Pacific Co.*, 421 F.2d 92 (9th Cir.1970), as a statement of the elements of an estoppel:

> (1) The party to be estopped must know the facts; (2) he must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended; (3) the latter must be ignorant of the true facts; and (4) he must rely on the former's conduct to his injury.

421 F.2d at 96. Other courts have phrased some of these same elements as a requirement that the plaintiff's reliance must be reasonable. *See Alpena Savings Bank v. United States*, 8 Cl.Ct. 249, 252 (1985). Moreover, in order to estop the government, it is essential to show that the representations were made by officers or agents of the United States acting within the scope of their authority. *Emeco*, 202 Ct.Cl. at 1015, 485 F.2d at 657.

Assuming that representatives of GSA and SBA made the statement that the clause "could not operate to the detriment of Glopak" and assuming that they were acting within the scope of their authority, Glopak still fails to establish the requisites of an estoppel because its reliance was not reasonable, or to state it in terms of *Emeco*, Glopak could not have been ignorant of the true facts. First, the statement in question cannot be read, in the context of the parties' negotiations, as more than a general commentary on the operation of the EPA clause. Theoretically, the clause should not act to the detriment of the contractor. The contract price increases or decreases as the market price, measured by the PPI, goes up or down. The situation would clearly be different if government employees had stated that the clause would not be enforced. Here, however, the alleged representation did not modify the contract terms. In fact, the contrary was

**104**

true. Glopak knew from the very fact that the government would not drop the clause that it would enforce it. Where Glopak's employees knew that the defendant was preserving its rights under the EPA clause, it cannot now base an estoppel argument on statements supposedly relinquishing that right.

■ A separate reason Glopak's reliance is unreasonable is that, even assuming the statement in question could be taken as something in the nature of a warranty that the clause could never reduce the contract price, Glopak knew better from its own experience. Again, Glopak was not ignorant of the purpose and operation of the clause, but rather was familiar with its operation from experience in a prior contract and, based upon this knowledge, tried to negotiate its removal. Plaintiff approached the contract with the clear understanding of the complexities and potential consequences of the clause and assumed the risk that unforeseen difficulties could be encountered. *See ITT Arctic Services, Inc. v. United States,* 207 Ct.Cl. 743, 752, 524 F.2d 680, 684 (1975) (contractor held to be knowledgeable as to the effect of the Wage Escalation Clause and risks of fixed-priced contracting because of prior experience).

*The Quantum Meruit Claim*

■ In Count V Glopak contends, on the basis of "quantum meruit and/or quantum valebant," that it is entitled to recover the actual increased costs of materials for production of the plastic bags. It's reliance on such a theory is unsound. In both cases to which Glopak cites in support of its theory, *Caffall Brothers Forest Products, Inc. v. United States,* 230 Ct.Cl. 517, 678 F.2d 1071, *cert. denied,* 459 U.S. 908, 103 S.Ct. 212, 74 L.Ed.2d 169 (1982) and *Clearwater Forest Industries, Inc. v. United States,* 227 Ct.Cl., 386, 650 F.2d 233 (1981), the Court of Claims failed to find the necessary implied-in-fact contract to serve as a basis for compensation mea-

sured by quantum meruit. In the present case Glopak has not even alleged any facts which would establish an implied-in-fact agreement on the part of the government to pay for actual costs incurred.[6] Rather, the undisputed facts lead to the conclusion that the written contract, in its entirety, expresses the parties' agreement and should be enforced.

### IV. *Conclusion*

Although the court is sympathetic to plaintiff's circumstances, it is not entitled to relief from the effect of the EPA clause, nor is it entitled to reimbursement beyond the contract amount. Plaintiff's cross-motion for partial summary judgment is therefore denied and defendant's motion for summary judgment is granted. The clerk is directed to dismiss the complaint and to enter judgment for defendant in the amount of $638,266.64. Costs to be borne by each party.

---

**6.** To the extent that Glopak's theory is based on a theory of unjust enrichment, that doctrine assumes the existence of a contract implied-in-law. This court would have no jurisdiction

over such a claim. *Aetna Cas. & Surety Co. v. United States,* 228 Ct.Cl. 146, 164, 655 F.2d 1047, 1059–60 (1982); *Penn Towne Builders v. United States,* 4 Cl.Ct. 677 (1984).