**GLOPAK CORPORATION,**
Plaintiff–Appellant,

v.

**The UNITED STATES,**
Defendant–Appellee.

No. 87–1607.

United States Court of Appeals,
Federal Circuit.

June 21, 1988.

James J. McCullough, Fried, Frank, Harris, Shriver & Jacobson, Washington, D.C., argued for plaintiff-appellant. With him on the brief was Carl Peckinpaugh.

Sharon Y. Eubanks, Commercial Litigation Branch, Dept. of Justice, Washington, D.C., argued for defendant-appellee. With her on the brief were Richard K. Willard, Asst. Atty. Gen. and David M. Cohen, Director.

Before MARKEY, Chief Judge, FRIEDMAN, Circuit Judge, and SKELTON, Senior Circuit Judge.

FRIEDMAN, Circuit Judge.

This is an appeal from a judgment of the United States Claims Court that awarded to the government the amount by which the government had reduced the contract price pursuant to an economic price adjustment clause, and denied the appellant's claim for the additional raw material costs it allegedly incurred in performing the contract. *Glopak Corp. v. United States,* 12 Cl.Ct. 96 (1987). We affirm.

I

In May 1982, the government awarded the appellant Glopak Corporation (Glopak) a contract to manufacture and supply the government with polyethylene plastic bags at a fixed price of approximately $6,456,-000. The contract had been set aside for economically and socially disadvantaged small businesses, pursuant to section

2[8](a) of the Small Business Act of 1953, as amended, 15 U.S.C. § 637(a) (1982). As frequently is the case with such arrangements, the prime contract was between the Small Business Administration (SBA), which administers the section 2[8](a) program, and the General Services Administration (GSA), which was the ultimate purchaser of the bags. The Small Business Administration in turn entered into a subcontract with Glopak, which agreed to supply the bags.

The contract, as had the solicitation for bids, contained an economic price adjustment clause (adjustment clause) which provided for increase or decrease in the contract price in the event of changes in the price of certain commodities used in manufacturing bags. With respect to the issue before us, the adjustment clause made the price changes dependent upon changes in the Producer's Price Index (PPI or Price Index) for polyethylene resin, a product which constituted approximately 75 percent of the raw material in the plastic bag. The Price Index is prepared by the United States Department of Labor. A similar clause had been used in a prior procurement of polyethylene plastic bags in which Glopak was involved. Glopak was, therefore, familiar with both the adjustment clause and the Price Index.

The adjustment clause provided that prices under the contract were "subject to price adjustment, upward or downward," in accordance with a specified formula on the basis of changes in the Price Index. The adjustment clause stated that the contractor was required to make a written request for a price increase, and that

> [i]n the event of a decrease, the Government has the right to unilaterally adjust the contract price(s).
>
> \* \* \* \* \* \*
>
> (f) The aggregate of the increase in any contract unit price made under this clause shall not exceed 30 percent of the original unit price. There is no percentage limitation of the amount of decrease made under this clause.

During the negotiation of the contract, Glopak attempted to eliminate the adjustment clause or to tie the price adjustment to Glopak's own cost of raw material rather than to the price of the material in the Price Index. "According to Glopak, this request was based upon its previous experience with GSA contracts involving such a clause, leading it to conclude that the clauses were irrational and likely to cause serious economic injury. Glopak asserts that notwithstanding its objections, GSA officials stated the EPA clause was mandatory and could not operate to the detriment of Glopak." 12 Cl.Ct. at 99.

The government refused to eliminate the clause. Two months after the contract was awarded, Glopak again requested that the adjustment clause be eliminated, but the government again refused to do so.

During the performance of the contract, the Price Index decreased 17.9 percent. As a result, the contracting officer modified the contract and reduced the contract price to reflect the drop in the Price Index. By letter, "Glopak challenged the downward price adjustment, contending that it would result in a windfall profit for the government and a substantial loss for the contractor. Glopak provided an analysis showing that while the PPI dropped almost 18 percent between April and July 1982, Glopak's raw material cost for polyethylene resin actually *increased* by more than 5 percent during the same period." *Id.* (emphasis in original).

There were further communications in which "Glopak once again asked GSA to defer implementing the modification because of severe financial consequences to the company. The modification was again delayed and Glopak completed contract performance in April and was paid at the original base contract price." *Id.* at 100.

Subsequently Glopak submitted to the contracting officer a claim for $34,165.48 for additional raw material costs Glopak asserted it had incurred in performing the contract. In her final decision the contracting officer awarded the government "$638,-266.64, the net price decrease under the EPA clause. This decision also denied Glopak's claim of $34,165.48, on the grounds

that there was no provision in the contract for adjustment of price based upon such costs." *Id.*

Glopak then filed the present complaint in the Claims Court. In the first three counts, Glopak asserted different theories for challenging the assessment of damages against it. Count III, which is the only one before us, alleged that "[i]t is unconscionable and against public policy to permit the government to recover any sums under its EPA claim against Glopak because such recovery would give the government a wholly undeserved windfall while resulting in a forfeiture for Glopak." *Id.* The complaint also sought recovery of $34,165.48 "on a theory of quantum meruit and/or quantum valebant." *Id.* (footnote omitted).

The government filed a counterclaim for the $638,266.64 the contracting officer had awarded against Glopak.

The government moved for summary judgment, and Glopak cross-moved for partial summary judgment on a count not before us. The Claims Court denied Glopak's cross-motion for partial summary judgment, granted the government's motion for summary judgment, dismissed Glopak's complaint, and entered judgment for the government for $638,266.64 on its counterclaim.

The court rejected Glopak's contention that enforcement of the adjustment clause would be "unconscionable." It ruled that there was "no indication that the clause could be considered unconscionable or oppressive at the time the contract was entered into" and that Glopak could not

claim surprise or lack of consent. Glopak had encountered a similar EPA clause in a previous contract with the GSA and SBA, and requested that the clause be removed from the present contract because of Glopak's concern that the index did not accurately mirror the resin market. Glopak was neither ignorant of the use of the EPA clause, nor unexposed to the vagaries of the petrochemical market. Moreover, the language of the clause itself was explicit that "[i]n the event of a decrease, the Government has the right to unilaterally

adjust the contract price[s]." ... Although there is no doubt that Glopak did not like the terms of the contract, it has failed to point to some type of oppression, surprise or vitiated consent necessary for this court to deny enforcement. *Id.* at 102–03.

The court rejected Glopak's contention that the government "should be estopped from seeking enforcement of the clause because representatives of SBA and GSA stated that it was for the contractor's benefit and could not operate to the detriment of Glopak. Glopak asserts that it entered into the contract as a result of these representations." *Id.* at 103. The court stated that this claim failed because Glopak had not established one of the elements of an estoppel, namely, that Glopak was "ignorant of the true facts," and that its reliance on these alleged statements by government representatives "was not reasonable." *Id.*

## II

Glopak's sole contention on this appeal is that there were disputed issues of material fact relating to Glopak's claim that the adjustment clause was unconscionable, and that the grant of summary judgment therefore was improper. According to Glopak, there were two disputed issues of material fact: (1) whether there was any real negotiation between Glopak and the government regarding inclusion of the clause in the contract; and (2) whether government officials misrepresented the effect of the clause because allegedly they told Glopak that the clause would not have any adverse effect upon the company. We agree with the Claims Court, however, that there were not disputed issues of material fact relating to the alleged unconscionability of the adjustment clause and that as a matter of law the government is entitled to recover on its counterclaim.

The Court of Claims described an unconscionable contract provision as "one 'which no man in his senses, not under a delusion, would make, on the one hand, and which no fair and honest man would accept on the other.' *Hume v. United States,* 21 Ct.Cl. 328, 330 (1886), *aff'd,* 132 U.S. 406, 10 S.Ct.

134, 33 L.Ed. 393 (1889)." *Fraass Surgical Mfg. Co. v. United States*, 571 F.2d 34, 40, 215 Ct.Cl. 820 (1978), *also quoted in Peters v. United States*, 694 F.2d 687, 694 (Fed.Cir.1982). The court further stated in *Fraass:* "The grant of discretion to deny enforcement to an unconscionable clause in the modern Uniform Commercial Code's Section 2–302 is not intended to permit courts to redistribute risks allocated by differences in bargaining power, but rather to prevent oppression and unfair surprise." *Id.* (citing U.C.C. § 2–302, Official Comment 1).

■ The Claims Court recognized that the alleged unconscionability of the adjustment clause must be determined "at the time the contract was entered into." 12 Cl.Ct. at 102. *Cf.* section 2–302(1) of the Uniform Commercial Code, authorizing a court to refuse to enforce a contract if it finds that the contract, or any clause thereof, was "unconscionable at the time it was made." The fact that the actual application of the clause had an adverse effect on Glopak would not justify retroactively invalidating it as unconscionable.

■ The Claims Court correctly ruled that the adjustment clause was not unconscionable. The clause was a two-way, not a one-way, street. If the Price Index rose, Glopak would be entitled to an increase in the contract price of not more than 30 percent. If, on the other hand, the Price Index dropped, the government would be entitled to a decrease in the contract price. The clause was not unconscionable because, as applied to Glopak, the Price Index dropped rather than rose, thus triggering a decrease in the contract price.

Glopak challenges the adjustment clause on the ground that because the clause was based upon changes in the Price Index that did not reflect changes in Glopak's own cost of material, it operated unfairly to Glopak's detriment. As the Claims Court noted (12 Cl.Ct. at 102), however, the Comptroller General has ruled that "[p]rice escalation clauses must reflect some objective standard other than the bidder's own prices as the basis upon which the price adjustment will be made. Otherwise, bidders could indiscriminately raise their prices after contract award and thus increase their entitlements under the price escalation clause." *American Transparents Plastic Corp.*, B–210898 (Comp.Gen. Nov. 8, 1983) (citation omitted).

The government's utilization of the objective Price Index prepared by the Labor Department was reasonable and appropriate since it was for the product (polyethylene resin) that constituted approximately 75 percent of the raw material in the plastic bags.

The Claims Court also correctly pointed out that Glopak could not "claim surprise or lack of consent" with respect to the adjustment clause based upon the Price Index, since it had "encountered a similar EPA clause in a previous contract with the GSA and SBA.... Glopak was neither ignorant of the use of the EPA clause, nor unexposed to the vagaries of the petrochemical market." *Id.* at 102. Glopak thus signed the contract with full awareness of the nature and possible operation of the escalation clause. It did so presumably as a matter of business judgment. It cannot now complain that as a result of changes in the Price Index, its performance of the contract did not work out financially as it had anticipated and hoped it would.

■ As noted, Glopak argues that there was a factual issue whether the government had negotiated the inclusion of the adjustment clause in the contract. Glopak twice urged the government to eliminate the clause, once before and once after the contract was executed, and the government twice refused to do so. We know of no requirement that the government must be willing to change any clause to which the other party objects.

Glopak obviously did negotiate with the government regarding the terms of the contract. Ultimately it signed an agreement that presumably was acceptable to it. It is not unusual in negotiating a contract for one party to insist on the inclusion of particular provisions. Such insistence does not make the parties' discussions any less a negotiation. Glopak's contention that the

government failed to negotiate about the elimination of the adjustment clause did not create any issue of material fact that precluded the grant of summary judgment.

 Glopak's other alleged factual issue —whether the government misrepresented the effect the adjustment clause would have upon the company—similarly did not preclude summary judgment. An affidavit by Glopak's secretary stated that during Glopak's discussions with the Small Business Administration prior to award of the contract, "both SBA and General Services Administration ("GSA") officials told me that the economic price adjustment clause could not operate to the detriment of Glopak." The affidavit did not identify the government officials who allegedly made the statements or indicate that Glopak entered into the contract because of those statements. From past experience, Glopak was familiar with the operations of the adjustment clause, and the contract on its face provided for prior adjustments "upward or downward."

In a letter written to the court after the briefs had been filed, Glopak called the court's attention to the recent decision in *Beta Systems, Inc. v. United States*, 838 F.2d 1179 (Fed.Cir.1988). In that case, according to Glopak, "the Court reversed the Claims Court's decision upholding the lawfulness of an Economic Price Adjustment ("EPA") clause because the clause improperly tied contract prices to a price index that did not approximate the contractor's material costs incurred in performing the contract."

Glopak has not correctly stated the holding in *Beta Systems.* The issue before the court with respect to the economic price adjustment clause there involved was whether the particular Bureau of Labor Statistics index used to determine price adjustments under that contract complied with the Defense Acquisition Regulations (DAR), as it was required to do. In granting summary judgment for the government, the Claims Court did not consider that issue.

This court reversed the grant of summary judgment and remanded the case to the

Claims Court "for determination of compliance with the DAR, and reformation [of the contract] if necessary to achieve such compliance." 838 F.2d at 1186. The court did not hold that summary judgment was improper because of the presence of disputed issues of material fact but only because the Claims Court had not decided an important legal issue. In *Beta Systems,* this court did not remand the case for a trial before the Claims Court, which is the relief Glopak seeks from us.

## CONCLUSION

The judgment of the United States Claims Court is

AFFIRMED.