ARMED SERVICES BOARD OF CONTRACT APPEALS

| | | |
|---|---|---|
| Appeal of -- | ) | |
| | ) | |
| Macro-Z Technology | ) | ASBCA No. 60592 |
| | ) | |
| Under Contract No. N44255-04-D-9122 | ) | |

APPEARANCES FOR THE APPELLANT:

Adam K. Lasky, Esq.
Howard W. Roth, III, Esq.
Alix K. Town, Esq.
Oles Morrison Rinker & Baker LLP
Seattle, WA

APPEARANCES FOR THE GOVERNMENT:

Craig D. Jensen, Esq.
Navy Chief Trial Attorney
Robyn L. Hamady, Esq.
Senior Trial Attorney

## OPINION BY ADMINISTRATIVE JUDGE WILSON
## ON THE GOVERNMENT'S MOTION FOR SUMMARY JUDGMENT

At issue in this motion is whether Macro-Z Technology's (appellant or MZT) 2015 claim is barred by the Contract Disputes Act's six-year statute of limitations. MZT submitted a claim in 2008, which was appealed to the Board and dismissed for failure to state a sum certain. The claim presently before the Board arose from the same facility construction as in the 2008 claim, but MZT is now asserting what it describes as a different legal theory for recovery, that of unconscionability. According to MZT, it did not know, and could not have known, the particular facts giving rise to its claim of unconscionability until the government produced certain records in 2009. The Board concludes there are no genuine issues of material fact in this appeal. The government's motion for summary judgment is granted for the reasons set forth below. The Board has previously issued two decisions relating to appeals under the same contract number. *Macro-Z Technology*, ASBCA No. 56711, 14-1 BCA ¶ 35,712; and *Macro-Z Technology*, ASBCA No. 56711, 12-1 BCA ¶ 35,000. Familiarity with those decisions is presumed.

## STATEMENT OF FACTS (SOF) FOR PURPOSES OF THE MOTION

1. On July 15, 2004, the Naval Facilities Engineering Command Northwest (NAVFAC or Navy) issued a Request for Proposals (RFP) for a Small Business Administration (SBA) § 8(a) Multiple Award Construction Contract. The RFP anticipated award of three to five indefinite-delivery, indefinite-quantity contracts, under

which additional task orders would be issued. (R4, tab 1 at 1-23[1]) The RFP stated that the task orders would "consist of new construction, renovation, alteration, demolition, and repair work, including any necessary design" (*id.* at 10). The task orders could cumulatively total $99 million, with all task orders to be awarded at firm-fixed prices ranging from $1 million and $6 million (R4, tab 21A at 1700).

2. The RFP stated the Navy anticipated awarding contracts to three to five offerors, that the seed project (first project), which was the Naval Air Station Whidbey Island Fire Station (WIFS or fire station), would be used as a component of the criteria to select the awardees, and that the most highly qualified offeror would be awarded the fire station seed project task order (R4, tab 1 at 1-4). The seed project included the "design and construction" of the fire station (R4, tab 1A at 88-92). The fire station RFP stated: "Project Budget: Not To Exceed $3.825M [million]" (*id.* at 79).

3. The RFP's Source Selection Plan (SSP) stated that the government intended to award without discussions but reserved the right to conduct discussions if determined to be in the interests of the government (R4, tab 6 at 1093). The Source Selection Board (SSB) (with Source Selection Authority (SSA) concurrence) was permitted to seek additional information through discussions, based primarily on the number of acceptable proposals received, whether the proposals established legitimate price and technical competition, and whether the proposals would permit accomplishment of the government's objectives (*id.* at 1094). The SSP required that the SSB Chairperson "[p]repare a pre-business clearance for SSA approval...before commencing discussions with all offerors" and that the proposals be re-evaluated (*id.* at 1088). The SSB Chairperson was also required to prepare a post-business clearance and final board report for SSA approval (*id.* at 1089).

4. The Technical Evaluation Board (TEB) was required to, among other things, review and evaluate technical proposals, document concerns for questioning the offerors when necessary, and reevaluate and assign rankings as a result of discussions (R4, tab 6 at 1089-91).

5. In response to written pre-proposal inquiries, the Navy confirmed that a contractor could replace, as opposed to renovate, the fire station if the proposal was "under the construction cost limitation [3.825M]" (R4, tab 3 at 944). The Navy also confirmed that complete demolition and replacement was an option, "if affordable" (*id.* at 945).

---

[1] Several documents in the Rule 4 file contain more than one page number. We are using the full number at the top right of the page. As appropriate, we eliminate the preliminary alphanumerical reference "GOV000."

2

*MZT's Proposal*

6. MZT submitted its price and technical proposal to the Navy on August 19, 2004 (R4, tab 5-5C). MZT's proposal was based on all new construction because keeping the existing fire station operating, including its sleeping quarters, during construction was not, in MZT's opinion, "practical" (R4, tab 21 at 1410). The narrative portion of the technical proposal stated, "After reviewing the proposed scope of work and inspecting the jobsite, our recommendation is to demolish the existing building and construct a new facility. The cost of doing so would be no more than renovating and adding on to the existing building," and noted that in "proposing a new building in lieu of a remodel, the design is not constrained by existing structure or infrastructure." (R4, tab 5C at 1049)

7. MZT's proposal noted that "the new design does propose to reuse the existing structural slab and pilings which will save additional cost" (R4, tab 5C at 1050). The technical proposal provided the following regarding meeting UFC 4-010-01 Anti-Terrorism/Force Protection (ATFP) criteria:

> The following section shows how our team will meet the standards and recommendations contained in the UFC 4-010-01 DoD MINIMUM ANTITERRORISM STANDS FOR BUILDINGS, 08 October 03. We are able to provide the following:
>
> 82-foot standoff distance to roadways and parking will be provided if parking can be relocated after coordination with the ROICC (Standard #1).
>
> A 10-meter unobstructed zone around the building to preclude the ability to hide a 6" high or larger object.

(*Id.* at 1050-51)

*The Pre-Negotiation Business Clearance Memorandum*

8. The pre-negotiation business clearance memorandum, dated September 7, 2004, contained a summary table identifying each of the 12 offerors, each offeror's price proposal, the adjectival ratings assigned to each offeror for each evaluation factor, each offeror's overall adjectival rating and the government estimate of $3,825,000. The memorandum concluded that only one offeror was technically acceptable, but that "[a]ll offerors have the potential to become technically acceptable." The SSA agreed with the SSB's recommendations to conduct "discussions with all offerors in order to obtain revised proposals." (R4, tab 21A at 1702)

3

*Pre-Award Discussion Questions issued to MZT*

9. The Navy issued written discussion questions to MZT on September 15, 2004, permitting MZT to respond in writing and submit a final proposal revision. The Navy asked, among other questions, for MZT to "[v]erify that your design will maintain a clear zone of 10 meters between buildings and security fences as per Unified Facility Criteria 4-010-01" and to "[r]eview your price and confirm or adjust it accordingly." (R4, tab 7 at 1132-34)

10. MZT responded to the Navy's discussion questions on September 17, 2004, submitting its final proposal revision. In response to the two discussion questions noted above, MZT stated that its design "meets the required setbacks...per Unified Facility Criteria 4-010-01" and confirmed its bid price of $3,999,872. (R4, tab 8 at 1154-61)

*Post-Negotiation Business Clearance Memorandum*

11. The post-negotiation business clearance memorandum, dated September 23, 2004, reflected that "[a]ll twelve of the initial offerors were issued discussion questions and responded," and that "[r]evised proposals were evaluated in accordance with FAR 15.305(a) and the Source Selection Plan" (R4, tab 21A at 1707). The post-negotiation business clearance memorandum contained a summary table identifying each offeror, each offeror's final proposed price, the adjectival rating assigned to each offeror for each evaluation factor, each offeror's overall adjectival rating, and the government estimate of $3,825,000. The recommendation was to award the seed project to MZT "as representing the best value to the government" and awarding three minimum guarantee contracts to three of the other offerors. (*Id.* at 1708)

12. On September 29, 2004, the Navy awarded Contract No. N44255-04-D-9122 to MZT (R4, tab 9 at 1-3), and on the same day issued MZT Task Order No. 0001 (TO-1) in the amount of $3,999,872 for the WIFS project (R4, tab 10). The contract price was revised several times to the final contract price of $4,313,443.57 (R4, tabs 13-14, 16-18). TO-1 required MZT to complete the WIFS project by March 6, 2006 (R4, tab 10 at 1210). The final completion date for the project was revised several times to the final date of June 27, 2006 (R4, tabs 13-14, 16, 18).

13. Starting in December 2004, the Navy issued 13 letters to MZT, stating that the WIFS project "was behind schedule and corrective actions were required" (R4, tab 22 at 4238, 4327-39). On or around November 23, 2005, the Navy began withholding 10% of invoiced amounts under FAR 52.232-5, PAYMENTS UNDER FIXED-PRICE CONTRACTS (SEP 2002), because MZT was behind schedule (*id.* at 4238). Beginning on May 1, 2006, the Navy began assessing liquidated damages in the amount of $1,850 per day under

4

FAR 52.211-12, LIQUIDATED DAMAGES – CONSTRUCTION (SEP 2000) (*id.* at 4238, 4335). The Navy accepted the work as complete on April 26, 2007 (*id.* at 4325).

*MZT's 2008 REA and Certified Claim*

14. On March 10, 2008, MZT submitted a Request for Equitable Adjustment (REA) to the contracting officer (CO) (R4, tabs 21, 21A-B).

15. The 2008 REA sought $5,434,297, composed of $4,823,797 for "direct costs, indirect costs, delays, and impacts" and $610,500 for return of withheld liquidated damages (R4, tabs 21, 21A-B). The $4,823,797 was made up of (1) $3,442,579 in "impacts to the work" damages based on 85 individual "B" and "V" variance claim items, (2) "delay damages," and (3) $752,560 in REA preparation costs" (R4, tab 21 at 1493-96).

16. MZT complained that the Navy failed "to exercise its regulatory and case law duty to disclose its superior knowledge that MZT's price was far lower than it should have been" to construct the project envisioned, and that "[i]nstead, the Navy overreached to grab a good deal while it could." Further, the Navy's objective was to "force this 8(a) contractor to build a far more elaborate facility than its bid price, and the RFP, would justify." (R4, tab 21 at 1409-16, 1428-29, 1433-37, 1501-05) No specific costs were attributed to these theories.

17. In support of its 2008 pre-award assertions, MZT attached three pre-award documents as exhibits: the as-enacted DD 1391, dated December 2, 2003, reflecting congressional approval for the fire station project as part of the FY2004 MILCON Program (DD 1391) as exhibit 4 (R4, tab 21A at 1685-95), and the pre-negotiation and post-negotiation business clearance memoranda (BCM) as exhibit 5 (*id.* at 1696-1708). In the 2008 REA, MZT alleged the Navy received 12 proposals which "were obviously not bidding on the same parameters, as the bids ranged from $3.9 to 7.4 million," and complained that "[t]he Navy has refused to produce the proposals of competitors to MZT" (R4, tab 21 at 1410).

18. Box 11 of the DD 1391 includes a summary of alternative means of achieving the project's requirements, including maintaining the status quo, renovation/modernization, lease, and new construction, and states that "Renovation/Modernization" is the "preferred alternative." "New Construction," it states, is a "feasible option but the life cycle costs exceeds the renovation alternative." (R4, tab 21A at 1689-90) Under "Analysis Results," the document reads:

> An economic analysis was conducted that evaluated the cost
> of constructing a new fire station at full BFR scope with the
> cost of space addition and renovation of existing main fire

5

station (Building 2526). The expansion and renovation alternative has a net present value of $4,758,000 almost 50% less than the net present value of $8,027,000 for the new construction alternative.

(*Id.* at 1690)

19. In particular, the 2008 REA complained of six main areas of Navy pre-award conduct:

(1) The Navy's estimate for renovation was understated. Regarding the project estimates, relying on the Navy's FY 2004 funding document, MZT stated that the Navy developed two estimates for the project: The first estimate was for the complete removal of the existing WIFS and 100% rebuild. This estimate was valued at $8,027,000. The second estimate was generally for 50% new construction and 50% renovation for a cost of $4,758,000 million. It is the second estimate that appears most problematic. The second estimate did not consider the extent of renovation that would be required.

There was no estimate for the necessary structural modifications that would be required in the renovation portion of the building. Significantly, the Navy did not consider the quantity of detail of work a renovation would require.

(2) The Navy desired new construction but knew it could not afford it. MZT argued that the Navy possessed an "objective to force this 8(a) contractor to build a far more elaborate facility than its bid price, and the RFP, would justify" because it wanted a newly constructed fire station but its "own estimate dictated that such a new construction would cost approximately $8 million while its budget was approximately $4 million." Consequently, according to MZT, the Navy drafted an RFP which called for renovating the existing station.

(3) The Navy withheld superior knowledge and overreached. The 2008 REA alleged "the Navy simply chose the lowest price without disclosing to MZT that its $3.9 million price was half of what the Navy estimated it would cost for all new construction, which MZT proposed" (R4, tab 21 at 1412). MZT alleged only the Navy had access to information which made the pricing inconsistencies in the bids obvious, and the Navy did not bring this superior knowledge to MZT's attention for discussion, nor did the Navy use "their own estimate when evaluating bids." According to MZT, the Navy "sought to leverage its strength and power against an 8(a) firm" and "used its muscle to obtain benefits far above the requirements of the RFP." Further, complained MZT, the Navy failed to exercise its regulatory and case law duty to disclose its superior knowledge that MZT's price was far lower than it should have been to construct the facilities as it had envisioned. Instead, the Navy overreached to grab a good deal while it could.

6

(4) The Navy manipulated the source selection process, held meaningless discussions, performed inadequate bid verification, and manipulated offeror's rankings. The 2008 REA alleged the Navy "snapped up" MZT's "marginal" bid by "manipulat[ing] the process to award to MZT," "focus[ing] exclusively on price," engaging in "meaningless discussions" and choosing the lowest price without disclosing to MZT that its proposed $3.9 million price was just half of what the Navy had estimated new construction would cost. MZT alleged that the Navy "did not follow the edicts contained in the Business Clearance Form." "The written discussions did not satisfy the requirements of the SSB" asserted MZT, and the Navy failed to responsibly perform "to the requirements of the SSB."

The 2008 REA alleged that the Navy did not evaluate the 12 proposals it received, with bids ranging from $3.9 to $7.4 million, in a proper, substantive way. According to MZT, the "Navy did not attempt to understand the scope of work MZT provided a bid for, and whether it met the Navy's expectations or truly could be delivered at the low bid price — considerations essential to determine the 'highest level of best value.'" The REA alleged that the Navy's conclusion that the price ranges were competitive, based only upon the quantity of offers, "was both inconclusive and misleading because under the Design-Build the proposers were proposing on entirely different work."

According to MZT, the Navy should have engaged in "discussions of importance" and considered at a minimum the price differentials of bids, regarding the scope of work either written or verbal, but these did not occur. The 2008 REA alleged the pre-award discussion letter issued to MZT "requested only relatively unimportant information, price notwithstanding." The letter gave "absolutely no hint that the government had grave doubts whether MZT could do what it was promising for basically half the price that the government determined would be required" and in "seeking a bargain too good to be true, the Navy's discussion with bidders, MZT in particular, were not meaningful."

MZT asserted the only item of work questioned in its bid was a stainless steel countertop, which MZT had missed and agreed to include at no extra cost. Other questions dealt with clearances around buildings. "Remarkably, the MZT bid was increased from marginal to Highly Acceptable, following inclusion of the countertops," thus proving, according to MZT, "that price was the only controlling consideration in the award."

(5) The RFP was deficient. MZT's 2008 REA alleged that that RFP was "hastily put together, unprofessional, and deficient" and composed of "poorly drafted bid documents" (R4, tab 21 at 1414, 1418). According to MZT, because the Navy "chose not to participate in any substantive cost or scope review event," it missed an opportunity which "would normally expose the inherent characteristics of the deficient RFP" (id. at 1414). MZT alleged that the Navy was aware that the WIFS project could not be

7

partially constructed as a renovation and that was "one primary obfuscating deficiency in the RFP."

(6) Unilateral Mistake in Bid. According to MZT, the Navy "breached its obligation to notify MZT of the potential mistake in bid" (R4, tab 21 at 1501). Citing FAR rules on bid mistakes, and describing the nature of this negotiated procurement, MZT argues the Navy had an obligation to ensure that MZT had not misconstrued the scope of work, concluding:

> [W]hat happened here was a violation of the government's obligations (1) of good faith and fair dealing and (2) to buy at a fair and reasonable price as mandated by FAR 15.402(A). These violations are particularly egregious, because the Navy was dealing with an 8(a) firm which the government should recognize would not be able to absorb the horrendous loss involved.

(*Id.* at 1409-1505)

20. The CO denied the majority of appellant's REA but agreed to compensate MZT $130,000 for two of the 85 post-award items (R4, tabs 18, 22). In denying the REA, the CO addressed MZT's pre-award assertions, stating: "The REA does not appear to directly tie to the source selection process any specific costs or schedule impacts asserted in the REA.... It remains the government position that the source selection was conducted in accordance with the Source Selection Plan and the RFP." (R4, tab 22 at 4239) The CO also noted that MZT "verified its price prior to award" and that "MZT as part of its price and technical proposal rationale and strategy, chose to construct new in lieu of renovation and addition" (*id.* at 4240).

21. MZT submitted a CDA certification on September 2, 2008, and asked the Navy to consider its REA as a CDA claim (R4, tab 23 at 4376-77).

22. By correspondence dated September 3, 2008, MZT's counsel wrote the commanding officer of NAVFAC NW, expressing "disappointment" in the CO's response to MZT's REA and alleging the CO ignored the "most compelling basis cited for relief, 'the failure of the government to exercise its regulatory and case law duty to disclose superior knowledge that MZT's price was far lower than it should have been to construct the facilities envisioned.'" Counsel continued, "the deficiencies by the Navy in the source selection process tainted the entire procurement and entitled MZT to reformation of the contract for full relief from its monetary losses." (R4, tab 23 at 4378) Counsel complained the CO's response denied "concepts of equity" in order for the Navy to "retain its unjust enrichment." He alleged that:

8

> [T]he Navy manipulated the source selection process to grab the lowest priced bid by changing the decision criteria announced in the RFP, by failing to engage in meaningful discussions, and by sending only a general boilerplate bid verification letter without even a sentence or word in there as to the gross mistake suspected.

(*Id.* at 4379)

23. MZT appealed the CO's deemed denial of its claim to the Board by correspondence dated January 16, 2009. *Macro-Z Technology*, ASBCA No. 56711, 14-1 BCA ¶ 35,712 at 174,858. On February 26, 2009, the CO formally denied MZT's certified claim (R4, tab 24).

24. On July 22, 2009, MZT filed a motion requesting "that the Board compel the disclosure of the requested information, specifically the 12 proposals (the 'WIFS Proposals') received by the Navy in response to its RFP for the Whidbey Island Fire Station Addition and Renovation Project." MZT alleged it needed the WIFS proposals in order to prove "the Navy breached its duty of good faith and fair dealing," and "to prove that the Navy's action, in relation to its acceptance of MZT's proposal, constitute a unilateral mistake" (gov't mot. at 19; app. mot. at 13-14).

25. MZT sought the proposals because it believed they would demonstrate the vast disparity between MZT's proposal price and the other offeror's prices, and that the others were proposing renovation as opposed to MZT's proposal for new construction. These differences, according to MZT, would provide "evidence that the CO was on constructive notice of a mistake in MZT's proposal" and be an additional factor proving unilateral mistake. (Gov't mot. at 20)

26. In a footnote to its motion, MZT acknowledged that:

> While MZT knows the final amount of each of the 12 WIFS Proposals (based on the Navy's disclosure of a Sept. 2004 Business Clearance Memorandum), it is both the final amounts as well as the content of these proposals that is relevant to MZT's case.

(Gov't mot., ex. 1 at 4 n.2)

27. The Board issued an Order on December 14, 2009, directing the Navy "to produce not later December 30, 2009, unredacted copies of the documents the Navy asserts are subject to the Trade Secrets Act, subject to the Protective Order entered this

same day" (gov't mot., ex. 2). These documents were provided to MZT after November 30, 2009 (app. resp. at 22, 42, ex. 1).

*MZT's Motion for Partial Summary Judgment*

28. On March 6, 2010, MZT moved for partial summary judgment. The motion asserted three entitlement theories:

> [U]nilateral mistakes prior to award about which the Navy knew or should have known; unconscionability associated with the alleged unilateral mistakes and acceptance of MZT's proposal for new construction at an "unrealistically low price;" and superior knowledge/misrepresentation...which induced MZT to bid at an "unrealistically low price" and alleged failure to disclose superior knowledge that the price was "unrealistically low."

*Macro-Z Technology*, 12-1 BCA ¶ 35,000 at 171,999. MZT quantified its pre-award claim (on a *quantum meruit* basis) for the first time in this motion, stating that it "should be entitled to recover its total reasonable costs incurred in the performance of the contract...(not to exceed the Navy's $8.150 million for new construction), less the amounts [$3,658,717.45] already paid by the Navy to MZT." *Macro-Z Technology*, 14-1 BCA ¶ 35,712 at 174,859. Neither the 2008 REA nor the certified claim requested rescission, *quantum meruit* restitution, or in any way quantified its pre-award claim (R4, tabs 21, 21A-B, 23). *Id.* at 174,859-60. The Board denied MZT's motion for partial summary judgment in February 2012. *Macro-Z Technology*, 12-1 BCA ¶ 35,000 at 172,011.

29. Between November 2012 and July 2013, at MZT's request, the Board dismissed with prejudice, all of MZT's post-award claims. In September 2013, upon motion by the Navy following MZT's "notice that it was dropping its unilateral mistake claim," the Board also dismissed MZT's eight mistake claims with prejudice, including where MZT alleged that it had "misread/misunderstood the RFP to allow new construction, though the RFP clearly specified that proposals were to be for renovation/addition." *Macro-Z Technology*, 14-1 BCA ¶ 35,712 at 174,858-59.

30. The parties elected to waive a hearing and submit the case for decision on the record in accordance with Board Rule 11. In its Rule 11 brief, MZT sought entitlement on a *quantum meruit* basis due to the Navy's pre-award conduct. In August 2014, the Board dismissed MZT's appeal for lack of jurisdiction on the basis that neither MZT's 2008 REA nor its certified claim sought a sum certain for its pre-award claim. *Macro-Z Technology*, 14-1 BCA ¶ 35,712 at 174,859-60. MZT appealed to the Federal Circuit, arguing its pre-award claim did contain a sum certain (app. resp. at 24). The Federal

Circuit affirmed the Board's decision on July 8, 2015. *Macro-Z Technology v. Mabus*, 793 F.3d 1375 (Fed. Cir. 2015).

*MZT's 2015 Unconscionability Claim*

31. On November 12, 2015, MZT submitted a claim (2015 claim) seeking $5,137,913 "for the excess cost of performance under Contract No. N44255-04-D-9122 ...because the Navy unconscionably accepted MZT's bid." The 2015 claim alleges the Navy "snapped up MZT's offer of new construction...at less than half the cost of the government estimate for new construction, and, in the process, intentionally sidestepped many of the procedures designed to safeguard against the execution of unconscionable contracts." (R4, tab 25 at 4384) MZT asserted its 2015 claim was timely because "MZT did not know, or have a reasonable basis to know, of its claim for unconscionability until certain source selection documents were produced in discovery to MZT on or after November 30, 2009." Before receiving these documents, MZT alleges, it "did not know that the Navy's government estimate for new construction was $8.150 million, more than double the amount of MZT's new construction proposal price." (*Id.* at 4387) According to MZT, it could show the two elements necessary for a contractor to recover on the basis of unconscionability — a large disparity in price between its proposal and the government estimate or other proposals, and evidence of overreaching or bad faith on the part of the government in awarding the contract (*id.* at 4388-89).

*Gross Disparity in Price*

32. The 2015 claim points out that the RFP was for a renovation/addition project, while MZT proposed new construction "under the mistaken belief that new construction would be no more expensive than renovation/addition." MZT provides a timeline of events leading to the July 2004 RFP release to bidders which it asserts clearly shows that throughout the development of the project, the government knew that the estimated cost of new construction was approximately double the estimated cost of renovation/addition, including the Enacted DD 1391 (dated December 2, 2003) which reflected a similar government estimate of $8.027 million for new construction. According to the claim, at this point, with a significant disparity between the price of the government estimate and MZT's low bid, "a presumption arises that the government had constructive notice of a possible error in the low bid." (R4, tab 25 at 4389-90)

*MZT's 2015 allegations of overreaching*

33. MZT's 2015 claim alleges, *inter alia*, that not only does the record show the Navy was aware of the vast disparity in price between MZT's proposal price and the government's own estimate for new construction, the record is also replete with examples of where the Navy "overreached and/or acted in bad faith" during the procurement process. According to the claim, the overreaching began with Navy's efforts to secure

11

congressional funding and ran through to the award to MZT. (R4, tab 25 at 4392) The 2015 claim further breaks down as follows:

(a) MZT alleges the Navy used a streamlined RFP which it knew was inappropriate for a project as complex as the WIFS and "was more likely to yield a bid mistake than most, especially when dealing with 8(a) contractors." The claim also alleges the Navy ignored suggested safeguards when drafting its streamlined RFP.

(b) The Navy knew its $3.825 million government estimate was insufficient, even for renovation/addition. MZT alleges that the Navy began preparing the DD 1391 with project estimates for the WIFS project no later than May 2000 and the Economic Analysis documents for the project comparing the cost of the new construction against the cost of renovation/addition no later than July 2000, and throughout "numerous revisions" to these documents, "one thing remained consistent – the estimated cost of new construction was approximately double the estimated cost of renovation/addition." (R4, tab 25 at 4389-90) Continuing, the claim asserts the Navy "[a]rtifically lowered[ed] the government estimate to obtain funding for the WIFS project, and then represented the $3,825 million figure to prospective bidders," knowing "that this figure was understated even for the renovation/addition" (*id.* at 4396-99). Further, according to the claim, "the Navy proceeded to bait offerors into proposing within its under-budgeted $3.825 million government estimate by disclosing that estimate to prospective bidders (even though doing so violated the FAR and constituted a misrepresentation)" (*id.* at 4392).

(c) The Navy, in response to pre-proposal inquiries, permitted bids for new construction as long as they were under the construction cost limitation of $3.825 million even though "the Navy had no reason to believe that new construction could be performed for under $3.825 million, and had every reason to believe it could not." The 2015 claim asserts the "non-disclosure" of the $8.150 million new construction estimate "served as bait for a low priced new construction offer, at a price that the Navy had every reason to believe was not possible." (R4, tab 25 at 4400)

(d) The Navy knew or should have known "that MZT's proposal was premised on a fundamental mistake in judgment" when the proposal stated that the cost of "demolishing the existing facility and construct[ing] a new facility...would be no more than renovating and adding on to the existing building." Further, the Navy "failed to take adequate steps to verify MZT's proposal, as the Navy never conducted any discussions with MZT that would have reasonably put MZT on notice of the vast disparity between MZT's price and the government estimate for new construction." (R4, tab 25 at 4401) "The Navy's mere request of MZT to 'confirm' price, without anything more is not adequate bid verification" (*id.* at 4403).

(e) MZT's 2015 claim alleges a price realism analysis was required by the language of the RFP but the Navy failed to adequately perform such an analysis, in part,

12

because the Navy "failed to take into account MZT's technical approach when examining its proposal price." The claim alleges that the Navy never compared MZT's new construction proposal price with the government estimate for new construction, but instead "compared MZT's new construction price against the government estimate for renovation/addition." (R4, tab 25 at 4403-06)

(f) According to the 2015 claim, the Navy falsely determined that adequate price competition existed on the basis of the initial proposals because at the time, no single proposal qualified for award. This false determination, alleges MZT, permitted the CO to avoid requesting cost and pricing data which "would have [made] blatantly clear that MZT's proposal was priced unconscionably low for new construction" and "constitutes overreaching." (R4, tab 25 at 4407-09)

(g) The 2015 claim alleges that the Navy manipulated the evaluation of MZT's proposal when it upgraded MZT's design submission from "marginal" to "highly acceptable" although MZT never cured the deficiency in its proposal the Navy had questioned. Therefore, MZT alleges its proposal was actually ineligible for award. The Navy did this, MZT avers, because without the manipulation, the Navy would not have been able to award by the upcoming end of the fiscal year and would lose funding for the project. (R4, tab 25 at 4409-11)

(h) The 2015 claim alleges that the Navy ignored concerns expressed by other bidders that the project could not be done within the Navy's budget. MZT cites another bidder, MARPAC, that had allegedly warned the Navy multiple times the seed project could not be done within the Navy's budget and whose principal, upon learning MZT had been awarded the project at $3.999 million, had written to the Navy's contracting specialist and CO, saying "I was shocked at the cost for the SEED project, but I guess those Californians know their stuff." (R4, tab 25 at 4411) Ignoring red flags raised by other bidders, MZT's claim alleges "the Navy did absolutely nothing to warn MZT or verify that its price was realistic." Instead, according to the 2015 claim, the Navy "snapped up [MZT's bid] without delay, even though it was too good to be true." The Navy's "failure to heed any of these concerns, in light of all the other red flags raised during this procurement, constitutes bad faith or overreaching." (*Id.* at 4412)

(i) MZT's 2015 claim also alleges the Navy ignored the government estimate for new construction. Instead, according to MZT, the Navy simply presumed the government estimate of $8.150 million must have been wrong, and MZT's proposal price must have been accurate. The Navy reran its economic analysis with MZT's proposal price, ignoring its own estimate of $8.150 million, which resulted in a finding that the total life cycle cost for new construction was less than that for renovation/addition. According to MZT's 2015 claim, this clearly violates FAR 36.214(b) requiring the Navy to confirm whether the error lies in the government estimate or the bid and to "make sure

both the offeror and the Government estimator completely understand the scope of the work." (R4, tab 25 at 4412-13)

(j) MZT's 2015 claim alleges that in order meet the 30 September 2004 deadline, "the SSB rushed the award to MZT, without the SSA's mandatory independent review and concurrence" which "is another instance of overreaching by [the] Navy in this procurement" (R4, tab 25 at 4392-4415).

34. The CO denied MZT's 2015 claim in a March 23, 2016 decision and MZT appealed to the Board. This appeal was docketed May 19, 2016.

35. On December 5, 2016, the government moved for summary judgment, arguing that MZT's 2015 claim is time-barred for two reasons: 1) the claim of unconscionability, about which appellant knew or should have known, accrued more than six years before it was submitted to the CO in 2015, or in the alternative; 2) MZT's 2015 claim is the same filing it submitted in 2008, and by law is time-barred (gov't mot. at 3-4).

## DISCUSSION

Summary judgment will be granted if a moving party has shown that there are no genuine issues of material fact and it is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390 (Fed. Cir. 1987).

The applicable substantive law identifies which facts are material and might affect the outcome of the appeal, thus precluding the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). We view such facts in the light most favorable to MZT as the non-moving party, accepting its version of them as true and drawing all reasonable factual inferences in its favor. *Liberty Lobby*, 477 U.S. at 252; *C. Sanchez and Son, Inc. v. United States*, 6 F.3d 1539, 1544 (Fed. Cir. 1993). However, the non-moving party must set forth specific facts showing the existence of a genuine factual dispute; conclusory statements and bare assertions are not sufficient. *Mingus*, 812 F.2d at 1390-91; *Pure Gold, Inc. v. Syntex (U.S.A.), Inc.*, 739 F.2d 624, 626 (Fed. Cir. 1984). Our job is not "'to weigh the evidence and determine the truth of the matter,' but rather to ascertain whether material facts are disputed and whether there exists any genuine issue for trial." *Holmes & Narver Constructors, Inc.*, ASBCA Nos. 52429, 52551, 02-1 BCA ¶ 31,849 at 157,393 (quoting *Liberty Lobby*, 477 U.S. at 249). A dispute is genuine only if, on the entirety of the record, a reasonable factfinder could resolve a factual matter in favor of the nonmovant. In other words, the burden on the movant is not to produce evidence showing the absence of a genuine issue of material fact, but to point out that there is an absence of evidence to support the nonmoving party's case. *Sweats Fashions, Inc. v. Pannill Knitting Co.*, 833 F2d 1560, 1562-3 (Fed. Cir. 1987).

14

The CDA contains a statute of limitations that provides that "each claim" related to a contract shall be submitted "within 6 years after the accrual of the claim." 41 U.S.C. § 7103(4)(A). While the Act does not define the term "accrual," the Federal Acquisition Regulation (FAR) defines "accrual of a claim" as "the date when all events, that fix the alleged liability of either the Government or the contractor and permit assertion of the claim, were known or should have been known." FAR 33.201. A party's failure to submit a claim within six years of accrual is an affirmative defense to the claim, for which the party invoking the defense bears the burden of proof. *Kellogg Brown & Root Services, Inc.,* ASBCA No. 58175, 15-1 BCA ¶ 35,988 at 175,823.

Irrespective of the type of claim being raised, "[t]he issue of 'whether the pertinent events have occurred is determined under an objective standard; a plaintiff does not have to possess actual knowledge of all the relevant facts in order for the cause of action to accrue.'" *FloorPro, Inc. v. United States,* 680 F.3d 1377, 1381 (Fed. Cir. 2012) (quoting *Fallini v. United States,* 56 F.3d 1378, 1380 (Fed. Cir. 1995)). The events fixing liability should have been known when they occurred unless it is reasonable to find they have been either concealed or were "inherently unknowable" at that time. *Raytheon Missile Systems,* ASBCA No. 58011, 13 BCA ¶ 35,241 at 173,017. Thus, "claim accrual does not turn upon what a party subjectively understood; it objectively turns upon what facts are reasonably knowable." *Id.*

To determine when a claim accrued, and the events that fix the alleged liability, we start by examining the legal basis for the particular claim. *Environmental Safety Consultants, Inc.,* ASBCA No. 54615, 07-1 BCA ¶ 33,483 at 165,984; *Gray Personnel, Inc.,* ASBCA No. 54652, 06-02 BCA ¶ 33,378 at 165,475. The legal basis of MZT's claim is that the Navy "unconscionably accepted MZT's bid," intentionally ignoring procedural safeguards which resulted in an "unconscionable contract" (SOF ¶ 31). Under the theory of unconscionability, a showing that "the government took advantage of the contractor at the time the contract was made and was obviously getting something for nothing" is required. *Digicomp Research Corp.,* ASBCA No. 44558, 94-2 BCA ¶ 26,834 at 133,471. Unconscionability has been defined as that which "shocks the conscience" and has been coupled with concepts such as "'overreaching,' 'taking undue advantage,' 'bad faith,' 'unfairness,' and 'unjust enrichment.'" *Uniflite, Inc.,* ASBCA No. 27818, 85-1 BCA ¶ 17,813 at 89,036. An unconscionable contract is "one 'which no man in his senses, not under a delusion, would make, on the one hand, and which no fair and honest man would accept on the other.'" *Glopak Corp. v. United States,* 851 F.2d 334, 337 (Fed. Cir. 1988) (quoting *Hume v. United States,* 21 Ct. Cl. 328, 330 (1886), *aff'd,* 132 U.S. 406 (1889); *Rockwell International Corp.,* ASBCA No. 41095, 97-1 BCA ¶ 28,726 at 143,388). A determination of unconscionability depends on the facts of each case at the time of contract award and is found "only in exceptional circumstances." *Turner-MAK (JV),* ASBCA No. 37711, 96-1 BCA ¶ 28,208 at 140,793.

MZT submitted its current claim on November 12, 2015 (SOF ¶ 31). Consequently, pursuant to the CDA's statute of limitations, if MZT's claim accrued prior to November 12, 2009, it is time-barred. 41 U.S.C. § 7103(a)(4)(A). The Navy argues that MZT's 2015 claim is time-barred because the undisputed facts demonstrate that the events fixing the government's alleged liability for unconscionably accepting MZT's bid occurred more than six years before November 12, 2015, and MZT knew or had reason to know of these facts in order to assert a claim based on unconscionability as early as when it submitted its REA March 10, 2008 (gov't mot. at 31).

In its response to the government's motion, appellant disputes a few of the facts enumerated in the Navy's statement of undisputed material facts (gov't mot. at 4-28; app. resp. at 4-33). However, MZT adopts them all, only adding additional quotes to some from the source document cited by the government, and sometimes adding legal argument (*see, e.g.*, app. resp. at 11, 20, 22-24, 26). MZT offers no explanation of the impact of its additions or how the additions create a conflict with the government's statements. MZT then proposes several additional facts alleging information learned by MZT following receipt of the source selection/protected materials after November 30, 2009 (app. resp. at 33-39). According to MZT, these documents revealed operative facts which MZT could not have known, nor should have known, which give rise to its 2015 claim of unconscionability (*id.* at 1-3, 39, 42). Here again, though, MZT's "additional facts" are offered with conclusory statements and scant explanation of why they are material or how they create an evidentiary conflict. *See Keystone Capital Services*, ASBCA No. 56565, 09-1 BCA ¶ 34,130 at 168,753 ("Mere arguments" or "bald assertions" cannot defeat a motion for summary judgment and a nonmovant must identify specific evidence that could be offered at trial.). As the Federal Circuit stated in *Barmag Barmer Maschinefabrik Ag v. Murata Machinery Ltd.*, 731 F.2d 831, 835-36 (Fed. Cir. 1984):

> A critical factor in a motion for summary judgment in a patent case, as in any other, is the determination by the court that there is no *genuine* issue of *material* fact. With respect to whether there is a genuine issue, the court may not simply accept a party's statement that a fact is challenged. *Union Carbide Corp. v. American Can Company*, 724 F. 2d at 1571, 220 USPQ at 588. The party opposing the motion must point to an evidentiary conflict created on the record at least by a counter statement of a fact or facts set forth in detail in an affidavit by a knowledgeable affiant. Mere denials or conclusory statements are insufficient.

MZT contends that the government's motion should be denied because there is a genuine issue of material fact that the November 12, 2015 claim of unconscionability accrued after November 30, 2009, arguing that the "2015 claim arises out of acts and

16

legal theories associated with the Navy's pre-award conduct concerning the source selection process that were unknowable" until the production of protected documents after November 30, 2009 (app. resp. at 4). According to MZT, an "unconscionability claim requires both (a) disparity in price and (b) acts of overreaching or bad faith by the Navy" and the documents establishing this second factor of an unconscionability claim (overreaching and bad faith) were not available at the time of its 2008 claim. MZT emphasizes that while its pre-award allegations in the 2008 submission "asserted the failure to disclose superior knowledge, violations of the duty of good faith and fair dealing and mistake in bid [it] did not anywhere mention unconscionability or assert that ground to the contracting officer." (App. resp. at 39)

### *The Navy's liability was fixed by events which occurred more than six years before November 12, 2015*

MZT's November 12, 2015 claim is based entirely on the Navy's pre-award conduct, all of which occurred on or before contract award on September 29, 2004, which is more than six years before November 12, 2015. In its 2015 claim, MZT alleges the Navy unconscionably accepted its bid, basing its argument on the gross disparity between its proposal price and the government estimate for new construction, and because of the numerous instances of overreaching in the procurement process (SOF ¶¶ 31, 33(a)-(j). When we consider the facts both parties agree on — the detailed RFP, issued on July 15, 2004 (SOF ¶¶ 1-4), the preproposal inquiries (SOF ¶ 5), the DD 1391 (SOF ¶ 18), the contents of the pre- and post-negotiation business clearance memoranda dated September 7 and September 23, 2004 (SOF ¶¶ 8, 11, 17), the pre-award discussion questions issued to MZT on September 15, 2004, and MZT's responses to discussion questions (SOF ¶¶ 9-10) — these facts establish that all the Navy's pre-award actions and omissions that fix its alleged liability for unconscionably accepting MZT's bid occurred more than six years before November 12, 2015.

### *MZT knew or should have known six years before November 12, 2015*

The government contends there is no genuine issue of material fact that MZT knew or should have known of its claim based on unconscionability as early as its March 10, 2008 REA due to the pre-award documents MZT possessed, and the allegations regarding Navy pre-award conduct MZT made in its 2008 filing (gov't mot. at 32).

MZT argues its claim for unconscionability was "unknowable," however, until after the receipt of the source selection/protected material after November 30, 2009, "such as the other proposals" (app. resp. at 1, 34-52). MZT also contends it learned from the protected documents that from "2001 to July 2004 (when the RFP was released to bidders) there were numerous revisions made to the DD13[9]1 and Economic Analysis" (*id.* at 39).

17

When we examine both the pre-award documents MZT possessed and submitted with its 2008 filing (the DD 1391 and the pre- and post-negotiation BCM), and the allegations it made in 2008 regarding the Navy's pre-award conduct, however, we agree the undisputed facts show that MZT knew or had reason to know of facts fixing the Navy's liability six years prior to November 12, 2009.

*Pre-award documents possessed and relied upon by MZT in 2008*

1. *The DD 1391*

The DD 1391 reflects an estimate of $8,027,000 for new construction. This put MZT on notice in 2008 of a $4 million-dollar disparity between its bid price and that estimate. (SOF ¶ 18) In the 2015 claim, MZT asserts that it did not know that the government's estimate for new construction was more than double its proposed price (SOF ¶ 31). However, in its 2008 filing, MZT alleges that the Navy's estimate for new construction was double that of MZT's proposal price based on the new construction estimate contained in the DD 1391 (SOF ¶ 18). In the 2008 REA, MZT cites the $8 million estimate and complains that the Navy accepted its $3.9 million bid without disclosing its bid was half of what the Navy estimated new construction would cost (SOF ¶¶ 19(1)-(3)).

2. *The pre- and post-negotiation BCM*

MZT possessed both the pre- and post-negotiation BCM and used them in support of its March 10, 2008 REA (SOF ¶ 17). These memoranda identify, among other things, each offeror and their bid price, the adjectival rating assigned to each offeror before and after pre-award discussions, and the $3.825 million government estimate for renovation used for purposes of price evaluation (SOF ¶¶ 8, 11, 18). On the basis of these documents, MZT made sweeping allegations about the Navy's pre-award conduct in its 2008 filing: alleging that the Navy possessed "an objective to force" MZT "to build a far more elaborate facility than its bid price and RFP would justify" (SOF ¶ 16), "overreached to grab a good deal while it could," "sought to leverage its strength and power against...MZT," "used its muscle to obtain benefits far above the requirements of the RFP," and sought "a bargain too good to be true" (SOF ¶¶ 19(1)-(3)). These allegations from MZT's 2008 submission are precisely those often cited, as discussed earlier, in defining the doctrine of unconscionability.

*Parallel allegations made by MZT in 2008 and 2015 regarding Navy conduct*

MZT asserts that it was not aware of the Navy's pre-award overreaching and bad faith in 2008 until after the release of documents on November 30, 2009 (app. resp. at 42). However, in 2008, MZT alleged that the Navy focused exclusively on price in spite of the

18

glaring "pricing inconsistencies" and "gross price range of offers" (SOF ¶ 19(4)). MZT asserted in 2008 that the Navy chose the lowest price because its goal was to award to the lowest bidder even though the RFP and the source selection plan dictated otherwise (*id.*). MZT alleged in 2008 that the Navy engaged in meaningless discussions, did not follow the guidance of the source selection plan because it failed to substantively evaluate the proposals or attempt to understand the scope of work MZT was proposing, nor did the Navy use its own estimate of $8 million for new construction when evaluating the bids (*id.*). In its 2008 submission, MZT also alleged that the Navy's conclusion during the source selection process that the price ranges were competitive or that there was adequate price competition was misleading because the proposals were not pricing the same scope of work (new construction vs. renovation/addition) (SOF ¶ 19(3)). MZT also asserted in its 2008 filing that the Navy manipulated the proposal evaluation process by unjustifiably increasing MZT's adjectival rating from marginal to highly acceptable (SOF ¶ 19(4)).

MZT argues that it needed the additional facts made available following the release of protected documents after November 30, 2009, to make its argument that the Navy's conduct was unconscionable (app. resp. at 42). It argues that the details of the other proposals which it only learned after release of the source selection documents after the protective order was in place are significant because they indicate the only price analysis performed by the Navy on MZT's proposal was a comparison of its proposal price for new construction against the government estimate for renovation/addition and against other proposal prices. Its proposal, insists MZT, should have been compared only against the one other offeror who bid on complete new construction, and should not have been compared to any of the offers that proposed renovation. (App. resp. at 42-45) This ignores the information MZT had in 2008 about the other proposals reflected in the pre- and post-negotiation memoranda as detailed above (SOF ¶¶ 8, 11, 17). MZT's argument, based on facts learned from the protected documents, may buttress its contentions on the merits of its claim, but the facts themselves are not material to what it knew or should have known in 2008. The undisputed facts demonstrate that MZT knew or had reason to know of the facts that fix the Navy's alleged liability for unconscionably accepting MZT's bid as early as its March 2008 REA. Its delay in doing so does not suspend the accrual of its claim. *See, e.g., Sparton DeLeon Springs, LLC*, ASBCA No. 60416, 17-1 BCA ¶ 36,601 at 178,312 ("delay by a contracting party assessing the information available to it does not suspend the accrual of its claim") (citing *Raytheon Missile Systems*, ASBCA No. 58011, 13 BCA ¶ 35,241 at 173,018).

### MZT's sum certain argument

According to MZT, its most significant argument is that it was unable to compute a sum certain until after November 30, 2009, and the release of the protected documents (app. resp. at 42-45). MZT tries to analogize its situation to that of the contractor in *Kellogg Brown & Root Services, Inc. v. Murphy*, 823 F.3d 622 (Fed. Cir. 2016) (*KBR v. Murphy*) (app. resp. at 55-60). In *KBR v. Murphy*, the Federal Circuit held that under a

19

cost-reimbursement contract, the prime contractor's claim relating to the termination of a subcontract did not accrue until the prime contractor received a claim from its subcontractor. *Id.* at 628. KBR's claim to the government was for subcontractor costs resulting from KBR's termination of the subcontract for default, which was later converted to a termination for convenience. *Id.* at 624. The Federal Circuit rejected the Army's argument that KBR's claim accrued when KBR terminated the subcontract because "the CDA does not require the filing of protective claims related to subcontractors while those claims are being resolved between the prime and the sub." *Id.* at 629. The Army had twice rejected KBR's attempts to submit the subcontractor's pass-through claim, and the Army expressly "required that KBR resolve disputed costs with the subcontractor before KBR could present a claim for reimbursement of those costs." *Id.* at 628. Thus, based on the terms set by the Army and the cost-reimbursement nature of the prime contract, prior to receiving a certified claim from its subcontractor, KBR's claim would have been premature. *Id.*

MZT's reliance on *KBR v. Murphy* is misplaced. To begin with, MZT seeks reimbursement for its own costs, not those of a subcontractor (SOF ¶ 31). Additionally, there is no evidence the Navy told MZT to defer submitting its claim until a later event occurred. MZT fixates on the language in the decision that states, "by FAR definition, a claim for the payment of money does not accrue until the amount of the claim, a sum certain, is known or should have been known." (App. resp. at 57) However, consistent with *KBR v. Murphy*, the Board has historically held that "use of estimated or approximate costs in determining the value of a claim is permissible so long as the total overall demand is for a sum certain." *Government Services Corp.*, ASBCA No. 60367, 16-1 BCA ¶ 36,411 at 177,538 (citing *Eaton Contract Services*, ASBCA No. 52888 *et al.*, 02-2 BCA ¶ 32,023 at 158,267; *Manhattan Construction Co.*, ASBCA No. 52432, 00-2 BCA ¶ 31,091 at 153,521); *Sparton DeLeon*, 17-1 BCA ¶ 36,601 at 178,312.

MZT contends that its 2015 claim was unknowable and therefore unquantifiable until after November 30, 2009, when the Navy began producing the protected documents because those documents "confirmed $8.150 million was the government estimate for new construction" (app. resp. at 45). However, MZT submitted the DD 1391 with its 2008 filing. The DD 1391 indicated that there was a government estimate of $8,027 million for new construction. (SOF ¶¶ 17-18) The difference between the two figures is only $123,000. The fact that MZT learned in 2009 that there was a government estimate for $123,000 more for new construction than the government estimate of $8.027 million it relied on in its 2008 filing is immaterial to whether it could have requested a sum certain before November 30, 2009. "When monetary damages are alleged, some extra costs must have been incurred before liability can be fixed and a claim accrued, but there is not requirement that a sum certain be established." *The Boeing Company*, ASBCA No. 58660, 15-1 BCA ¶ 35,828 at 175,190 (citing *Gray Personnel, Inc.*, ASBCA No. 54652, 06-2 BCA ¶ 33,378 at 165,476). It only means MZT could have adjusted its demand during litigation based on additional facts learned through discovery as "[c]ourts

and boards have readily adjudicated properly certified claims that were later modified in the amount sought, as additional cost information became available." *J.S. Alberici Construction Co. & Martin K. Eby Construction Co. (JV)*, ENG BCA No. 6179, 97-1 BCA ¶ 28,639 at 143,008. The Board in *Alberici* stated that contractors routinely changed the amounts claimed as relevant information was obtained and analyzed. (*Id.* (citing *Tecom, Inc. v. United States*, 732 F.2d 935, 937 (Fed. Cir. 1984)).

There is no evidence that MZT could not have reasonably requested a sum certain from the government for an "unconscionably priced contract" until after November 30, 2009. Based on MZT's knowledge of the DD 1391's $8,027,000 estimate for new construction in 2008, MZT "reasonably could have requested a sum certain from the government" more than six years before submission of its unconscionability claim on November 12, 2015. Its argument that its claim was not quantifiable before November 30, 2009, is not persuasive.

Further, MZT misinterprets the Board's language when it dismissed the earlier appeal based on MZT's 2008 submission, ASBCA No. 56711, for failing to state a sum certain (app. resp. at 3, 24). In discussing what a sum certain is, the Board stated that a sum certain can be determined, even when no exact dollar amount is stated, when a proper formula is provided by a contractor. *Macro-Z Technology*, 14-1 BCA ¶ 35,712 at 174,860 (citing *PHI Applied Physical Sciences, Inc.*, ASBCA Nos. 56581, 58038, 13 BCA ¶ 35,338 at 173,334) ("Although the amount sought was not expressly totaled by appellant, a sum certain total is readily calculable by simple arithmetic."). The Board pointed out that MZT's formula, the difference between the Navy's last estimate of new construction costs of $8,027,000, and the cumulative payments received of $3,658,717.45, was not provided until 13 months after the filing of the appeal, in MZT's March 2010 motion for partial summary judgment. *Macro-Z Technology*, 14-1 BCA ¶ 35,712 at 174,860. MZT interprets this to mean that it would not have been able to determine a sum certain until 13 months after the filing of the appeal (app. resp. at 24). That is not what the Board said. The Board simply pointed out that MZT did not assert its sum certain until 13 months after filing its appeal. *Macro-Z Technology*, 14-1 BCA ¶ 35,712 at 174,860. The Board concluded that MZT's 2008 submission "consisted of two claims: one that represented an MZT post-award claim and that claim was submitted in a sum certain; and one that represented an MZT pre-award claim and that claim was submitted without a sum certain." *Id.* The Board stated that our "jurisdiction to decide an appeal from a contractor claim depends on the prior submission of the claim to a CO for a decision." *Id.* Because MZT's pre-award claim with an articulated sum certain had not been submitted to the CO, the Board found we had no CDA jurisdiction and the appeal was dismissed. *Id.* When it made its filing in 2008, MZT knew the Navy's last estimate for new construction was $8,027,000, and it knew what payments it had received. MZT could have stated a sum certain at that time. The ability to figure and assert a sum certain did not arise only after MZT received the protected documents in 2009.

21

What MZT knew in 2008 is further illuminated in its counsel's September 3, 2008, letter to the NAVFAC commanding officer. In that letter, MZT's counsel alleged that deficiencies in the source selection process "tainted the entire procurement," and complained that the CO's denial of the REA denied "concepts of equity" so that the Navy "can retain its unjust enrichment." (SOF ¶ 22) Clearly, MZT was aware of the factual predicate of its claim for unconscionability at that time, more than six years prior to its November 12, 2015 claim assertion.

*No genuine issue of material fact that MZT's 2015 claim is the same as its 2008 submission, thus confirming what it knew in 2008*

Both parties agree that MZT submitted a claim regarding the fire station project in 2008 (certified on September 2, 2008) which included allegations regarding the Navy's pre-award and post-award conduct (SOF ¶¶ 14-19, 21). Both also agree MZT submitted a claim on November 12, 2015, regarding the Navy's pre-award conduct (SOF ¶ 31). The government argues that because the 2008 submission on pre-award conduct was dismissed by the Board on jurisdictional grounds, and that determination was upheld by the Federal Circuit, and the time to appeal the Federal Circuit's decision has expired, resubmission of the same claim at this point would clearly be time-barred because they are the same claim (gov't mot. at 36-45). Arguing that these two "claims" are the same claim, however, fails to acknowledge that as a matter of law, the Board found that the 2008 pre-award conduct submission, because there was no sum certain, was not a claim. A comparison of MZT's 2008 filing to its 2015 claim, however, demonstrate that MZT knew or should have known about its unconscionability claim when it made the filing in 2008, and is thus time-barred from doing so now.

According to MZT, its "2015 claim articulates a different legal theory unconscionability and is based on different operative facts unknowable by MZT until after November 30, 2009" (app. resp. at 63). However, the facts, as we cite herein from the two filings, are the same both in 2008 and 2015. Contending it is now asserting a different theory does not help MZT. A contractor cannot reset the clock on a claim by simply asserting a different theory. *Shaw Environmental, Inc.*, ASBCA No. 57237, 12-1 BCA ¶ 34,956 at 171,844.

MZT contends that its March 2008 submission on pre-award issues was stated as superior knowledge, but the 2015 claim, asserting unconscionability, is seeking a different form of relief: *quantum meruit* (app. resp. at 57). According to MZT, because the 2015 claim does not "request the same relief" as what was sought in 2008, the two filings "do not arise from substantially the same set of operative facts" (*id.* at 62). This makes quite a leap. The problem with MZT's 2008 filing, as the Board found, was that it did not seek relief, i.e., a sum certain. In the 2015 claim, on the same facts complained about in 2008, MZT has articulated the relief it is seeking. In addressing the impact of

22

relief sought when the facts are the same, the Supreme Court has said that "two suits are for or in respect to the same claim when they are based on substantially the same operative facts." *United States v. Tohono O'odham Nation*, 131 S. Ct. 1723, 1730 (2011). Merely adding factual details or legal arguments does not create a different claim. *K-Con Building Systems, Inc. v. United States*, 778 F.3d 1000, 1006 (Fed. Cir. 2015).

It is clear that MZT is seeking relief on the same operative facts — in both its filing in 2008 and in its subsequent 2015 claim, thus revealing what MZT knew in 2008. In both instances, MZT is seeking monetary relief for the Navy's actions and omissions prior to award (SOF ¶¶ 22, 28, 30-31). In both, MZT asserts the Navy was aware of the gross disparity in price and failed to disclose it (SOF ¶¶ 19(1)-(2), (4), 31, 33(b), (d)). Both allege the Navy desired new construction and "snapped up" MZT's offer even though it was low when compared with the government estimate (SOF ¶¶ 19(3)-(4), 31). Both the 2008 submission and the 2015 claim allege numerous instances of Navy overreaching in awarding to MZT who was the low bidder proposing new construction (SOF ¶¶ 19(3)-(4), 33(a)-(h)). Both allege the Navy failed to notify MZT of a mistake in bid — that new construction could not be accomplished at MZT's bid price (SOF ¶¶ 19(3), (6), 33(d)). Both allege the RFP was deficient. In its 2008 filing, MZT declared that the RFP was "hastily put together" and called for renovation and additions, even though the Navy was aware that the fire station "could not be partially constructed as a renovation" (SOF ¶ 19(5)). In the 2015 claim, MZT asserts the streamlined RFP was inappropriate for use on a project as complex as the WIFS (SOF ¶ 33(a)). Both suggest the Navy's estimate for renovation was problematic and understated. In 2008, MZT alleged the estimate for renovation and addition was problematic because it did not consider the extent of renovation that would be required (SOF ¶ 19(1)). In 2015, MZT's claim alleges the Navy "artificially lowered the government estimate to obtain funds for the project" and "baited offerors" by "representing the $3,825 million figure...to prospective bidders" when the Navy knew that figure was understated (SOF ¶ 33(b)). Both allege the Navy did not consider the scope or technical approach by bidders and just looked at price alone (SOF ¶¶ 17, 19(4), 33(e), (g)). Both allege that the Navy ignored its $8 million estimate for new construction, failing to conduct a price realism analysis (SOF ¶¶ 19(3), 33(e)). Both allege the Navy manipulated the proposal evaluation process to award to MZT by inadequately verifying the bid, engaging in meaningless discussions, focusing exclusively on price, falsely declaring there was adequate price competition, and unjustifiably raising the rating of MZT's proposal from "Marginal" to "Highly Acceptable" following pre-award discussions (SOF ¶¶ 19(4), 33(d), (h)). In the 2008 filing, MZT argued that the Navy, prior to award, withheld superior knowledge and failed to notify MZT of a mistake in bid, that it violated its duty of good faith and fair dealing, along with its duty to buy at a fair and reasonable price (SOF ¶¶ 16, 19(3), (6)). In the 2015 claim, MZT alleges the Navy withheld superior knowledge, failed to notify MZT of a bid mistake, and engaged in "overreaching bad faith" in source selection (SOF ¶ 31).

While not using the term "unconscionability" in its 2008 submission, the theories expounded in 2008 are those associated with or derived from the doctrine of unconscionability, as defined earlier, as that which "is associated with such concepts as 'overreaching,' 'taking undue advantage,' 'bad faith,' 'unfairness,' and 'unjust enrichment,'" and "indistinguishable from the other party's knowledge or reason to know of a mistake." *Uniflite, Inc.*, ASBCA No. 27818, 85-1 BCA ¶ 17,813 at 89,036. As the Board noted in *DynCorp International LLC*, ASBCA No. 56078, "[t]he doctrine of unconscionability requires no separate analysis [from that of unilateral mistake] because unilateral mistake is a descend[a]nt from the doctrine of unconscionability." *DynCorp*, 09-2 BCA ¶ 34,290 at 169,407 n.3.

MZT's additional factual allegations in the 2015 claim are that the Navy began preparing estimates for the fire station in 2000 and each revision to documents regarding the project showed the cost of new construction to be approximately double the cost of renovation/addition, the Navy artificially lowered its estimate in order to obtain funding and rushed the procurement process, the project was under budgeted by about $2 million, the Navy ignored concerns of one bidder who expressed "shock" at MZT's price, and the Navy selected awardees prior to the SSA's review and concurrence. (SOF ¶¶ 33, (b), (h)-(i)). Accepting these facts as true, as we must for purposes of this motion, does not change the essential nature of or operative facts of what MZT asserted in its 2008 submission. The additional facts are not material as they do not change the thrust of MZT's 2008 submission. *Lockheed Martin Aircraft Center*, ASBCA No. 55164, 07-1 BCA ¶ 33,472 at 165,934 (a new legal theory based on the same operative facts as the original claim does not create a new claim). MZT complains of the same government conduct in its 2015 claim as in its 2008 submission, legally and factually, thus clearly demonstrating that MZT knew of its claim in 2008. The 2015 claim is masquerading as something "new" in an attempt to evade the CDA's six-year statute of limitations.

While presenting allegedly more details of government misconduct, the additional facts MZT cites do not create "an evidentiary conflict" as required to prevail on summary judgment. *Mingus*, 812 F.2d at 1390-91.

24

## CONCLUSION

There is no genuine issue of material fact that the events fixing any Navy liability occurred and were known or should have been known more than six years before MZT submitted its November 12, 2015 claim to the CO. We grant the government's motion for summary judgment and deny the appeal.

Dated: May 30, 2019

OWEN C. WILSON
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I concur

JOHN J. THRASHER
Administrative Judge
Chairman
Armed Services Board
of Contract Appeals

I concur

ALEXANDER YOUNGER
Administrative Judge
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 60592, Appeal of Macro-Z Technology, rendered in conformance with the Board's Charter.

Dated:

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals